UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KAYLA TAYLOR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BIOHAVEN LTD., VLAD CORIC, and MATTHEW BUTEN,<br><br>Defendants. | **Case No. 3:25-cv-01120 (VAB)**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Date: Mar. 17, 2026 |

# TABLE OF CONTENTS

NATURE OF THE ACTION ..... 1
JURISDICTION AND VENUE ..... 9
PARTIES ..... 9
CONFIDENTIAL WITNESSES ..... 11
SUBSTANTIVE ALLEGATIONS ..... 11
Background ..... 11
The FDA Approval Process ..... 15
Troriluzole ..... 20
BHV-7000 ..... 28
Materially False and Misleading Statements Issued During the Class Period ..... 33
The Truth Begins to Emerge ..... 37
The Truth Continues to Emerge ..... 73
Regulation S-K Item 303 ..... 83
SCIENTER ALLEGATIONS ..... 83
PLAINTIFF'S CLASS ACTION ALLEGATIONS ..... 86
COUNT I ..... 89
(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ..... 89
COUNT II ..... 92
(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ..... 92
PRAYER FOR RELIEF ..... 93
DEMAND FOR TRIAL BY JURY ..... 93

Lead Plaintiff John C. Sasse ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Biohaven Ltd. ("Biohaven" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Biohaven securities between March 24, 2023 and January 5, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Biohaven is a biopharmaceutical company that purportedly seeks to discover, develop, and commercialize therapies for immunology, neuroscience, and oncology. Because Biohaven had no approved products and depended almost entirely on the success of its clinical-stage pipeline, investor valuation of the Company was heavily tied to the perceived regulatory prospects of its lead drug candidates.

3. The Company is developing, among other product candidates, troriluzole for the treatment of spinocerebellar ataxia ("SCA") as well as BHV-7000 for the treatment of bipolar disorder, and other neuropsychiatric disorders, including major depressive disorder ("MDD"). As alleged herein, Defendants repeatedly misrepresented the strength of the clinical evidence supporting these programs and concealed significant scientific and regulatory risks that materially undermined the likelihood that these drugs would demonstrate efficacy or obtain regulatory approval.

4. In May 2022, Biohaven's Phase 3 randomized, double-blind, placebo-controlled clinical trial evaluating troriluzole's efficacy as a treatment for SCA called Study BHV4157-206 ("Study 206") failed to meet its primary endpoint. Although Defendants acknowledged that Study 206 failed to achieve statistical significance on its prespecified primary endpoint, they repeatedly represented that post-hoc subgroup analyses and related exploratory findings demonstrated clinically meaningful treatment benefits and supported the drug's regulatory prospects, while failing to disclose that such analyses do not constitute the type of adequate and well-controlled evidence of effectiveness ordinarily required for regulatory approval.

5. Approval of a new drug requires "substantial evidence" of effectiveness derived from adequate and well-controlled clinical trials demonstrating statistically significant improvement on prespecified endpoints. Because Study 206 failed to meet its primary endpoint, Biohaven's ability to obtain approval depended on whether the Company could generate additional reliable evidence demonstrating clinical efficacy sufficient to satisfy this regulatory standard.

6. Despite Study 206's failure, in May 2023, Biohaven announced that it had submitted a New Drug Application ("NDA") with the U.S. Food and Drug Administration ("FDA") for troriluzole as a treatment for SCA (the "troriluzole NDA"). In support of that

submission, Defendants repeatedly told investors that post-hoc analyses of Study 206 demonstrated treatment benefits in a subgroup of patients with the most common form of SCA, and cited exploratory findings to argue that the drug produced clinically meaningful efficacy despite the trial's failure to achieve statistical significance in the overall study population.

7. On July 27, 2023, Biohaven issued a press release disclosing that the FDA had issued a "refusal to file" letter for the troriluzole NDA, refusing even to review the application because Study 206 had failed to meet its primary endpoint.

8. On this news, Biohaven's stock price fell $5.38 per share, or 22.61%, to close at $18.42 per share on July 27, 2023.

9. Despite the FDA's refusal to file the troriluzole NDA, Defendants continued to assure investors that the underlying clinical data demonstrated meaningful treatment benefits and that the Company retained a viable pathway to regulatory approval.

10. After the FDA issued the RTF, Biohaven sought to overcome the Study 206 failure by relying on an externally controlled real-world evidence analysis intended to demonstrate that patients treated with troriluzole experienced slower disease progression than untreated patients, referred to as Study BHV4157-206-RWE ("Study 206-RWE"). The study compared long-term outcomes among patients treated with troriluzole in the open-label extension of Study 206 to disease progression observed in external natural-history cohorts of untreated SCA patients drawn from observational disease registries. Defendants repeatedly characterized this analysis as demonstrating a robust and clinically meaningful slowing of disease progression and emphasized that the study's design and statistical analysis plan had been developed with FDA input and were consistent with FDA guidance regarding the use of real-world evidence.

11. By repeatedly emphasizing that Study 206-RWE had been developed with FDA input and was consistent with the agency's guidance on real-world evidence, Defendants created the misleading impression that regulators had endorsed the study's methodology as capable of supporting regulatory approval.

12. On December 16, 2024, Biohaven issued a press release announcing, *inter alia*, that it had resubmitted the troriluzole NDA to the FDA following additional purportedly positive efficacy data and "completion of a pre-NDA meeting in" the fourth quarter of 2024.

13. At no point did Defendants reveal that regulators had expressed significant concerns regarding the reliability of the Company's proposed reliance on post-hoc analyses and externally controlled real-world evidence comparisons rather than a successful randomized controlled trial demonstrating efficacy on a prespecified endpoint.

14. Unbeknownst to investors, during regulatory interactions with the Company beginning in 2023 and continuing through 2024, the FDA repeatedly warned Biohaven that its proposed reliance on externally controlled real-world evidence comparisons between patients treated with troriluzole and natural-history cohorts would likely be insufficient to establish the substantial evidence of effectiveness required for approval, particularly because Study 206 had failed to meet its primary endpoint. The FDA further warned that externally controlled comparisons using natural-history cohorts would be susceptible to significant bias and would likely be insufficient to establish substantial evidence of effectiveness absent an unusually large treatment effect.

15. Nevertheless, throughout the Class Period, Defendants repeatedly assured investors that the clinical data supporting its regulatory submissions for troriluzole demonstrated robust and clinically meaningful efficacy and supported a viable pathway to regulatory approval.

16. Defendants likewise misled investors regarding the prospects of BHV-7000, the Company's lead asset from its Kv7 ion channel activator platform. Kv7 potassium channel activators have historically been developed and used as treatments for epilepsy because they reduce neuronal excitability. Although some research has explored potential antidepressant effects of Kv7 activation, Biohaven pursued development of BHV-7000 for the treatment of acute manic episodes associated with bipolar disorder—an indication for which this drug class had not previously demonstrated clinical efficacy. As a result, Biohaven's decision to pursue BHV-7000 for bipolar mania represented a significant scientific departure from the drug class's historically studied indications. Regardless, Defendants repeatedly portrayed preliminary biomarker and pharmacodynamic findings as evidence that BHV-7000 had strong therapeutic potential for neuropsychiatric indications.

17. With investors focused on the progress of Biohaven's lead pipeline candidates, throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) troriluzole's regulatory prospects as a treatment for SCA, and/or the sufficiency of data that Biohaven submitted in support of troriluzole's regulatory approval for this indication, were overstated; (ii) the clinical data underlying Biohaven's regulatory submissions, including post-hoc subgroup analyses and externally controlled real-world evidence comparisons, did not provide reliable evidence of clinical efficacy or satisfy the FDA's standards for demonstrating effectiveness; (iii) Biohaven's externally controlled real-world evidence analyses did not align with FDA guidance and the FDA had repeatedly warned Defendants that such analyses would likely be insufficient to establish substantial evidence of effectiveness as required for approval absent an unusually large and robust treatment effect; (iv) BHV-7000's purported efficacy and clinical prospects for neuropsychiatric indications were overstated because the Company relied

primarily on preliminary biomarker and pharmacodynamic observations that did not demonstrate clinical benefit in patients and no scientific data existed to validate testing BHV-7000 for bipolar mania; (v) due to the foregoing, the Company's regulatory prospects and pipeline value were materially more uncertain than Defendants represented; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

18. On March 3, 2025, Biohaven issued a press release reporting its Q4 and full year ("FY") 2024 financial results and recent business developments. Therein, Biohaven disclosed that recent data from a late-stage study of BHV-7000 in bipolar mania failed to demonstrate efficacy, as the drug "did not statistically separate from the comparator on the Young Mania Rating Scale primary outcome measure[.]"

19. On this news, Biohaven's stock price fell $5.12 per share, or 13.77%, to close at $32.06 per share on March 3, 2025.

20. Despite this negative clinical result, Defendants continued to portray BHV-7000 as a promising therapy and emphasized that the drug could still succeed in other neuropsychiatric indications, including MDD. These reassurances were misleading because Defendants continued to promote BHV-7000's prospects for other psychiatric indications based on the same preliminary biomarker observations and mechanistic hypotheses that had failed to translate into clinical efficacy in the bipolar trial. Defendants' misstatements provided investors with the false impression that the bipolar study failure did not undermine the broader clinical prospects of the Kv7 platform for mood disorder indications.

21. Regarding troriluzole, on April 25, 2025, multiple news reports emerged that, according to the EMA, Biohaven had withdrawn its troriluzole MAA in late March 2025.

22. On this news, Biohaven's stock price fell $3.56 per share, or 15.21%, to close at $19.84 per share on April 25, 2025.

23. Nevertheless, Defendants continued to maintain that the troriluzole regulatory program remained on track and repeatedly emphasized the purported strength of the clinical data supporting the pending NDA, thereby reinforcing the misleading impression that the application was supported by reliable evidence demonstrating clinically meaningful efficacy. These statements reassured investors that regulatory approval remained likely despite the withdrawal of the European application.

24. Then, on May 14, 2025, Biohaven issued a press release "announc[ing] that the Division of Neurology 1 within FDA's Office of Neuroscience informed the Company that they are extending the [Prescription Drug User Fee Act ('PDUFA')[1]] date for the troriluzole [NDA] for the treatment of [SCA] by three months to provide time for a full review of Biohaven's recent submissions related to information requests from the FDA." The press release further stated that "[t]he Division also informed Biohaven that it is currently planning to hold an advisory committee meeting to discuss the application, but no date has been scheduled."

25. On this news, Biohaven's stock price fell $3.84 per share, or 19.53%, to close at $15.82 per share on May 15, 2025.

26. Even after the FDA extended the PDUFA date and indicated that it planned to convene an advisory committee meeting to discuss the application, Defendants continued to represent that the regulatory review process was proceeding normally and that the clinical data supporting the application demonstrated a favorable benefit-risk profile.

[1] Once the FDA accepts a filing for the approval of a drug, the agency must complete its review process within 10 months in most cases. The date at the end of the review period is referred to as the PDUFA date.

27. The truth regarding Biohaven's pipeline continued to emerge later in 2025. Specifically, on November 5, 2025, Defendants disclosed that the FDA had issued a Complete Response Letter ("CRL") rejecting the troriluzole NDA after determining that Biohaven had failed to establish substantial evidence of effectiveness and that the externally controlled analyses on which the Company relied were methodologically flawed and incapable of supporting approval. The CRL explicitly stated that the FDA had previously and repeatedly warned Biohaven that, *inter alia*, its study based on real world evidence would likely be inadequate to provide substantial evidence of efficacy and that analyses of the data would be susceptible to significant bias.

28. On this news, Biohaven's stock price fell $5.61 per share, or 40.22%, to close at $8.34 per share on November 5, 2025, on unusually heavy trading volume.

29. Then, on December 24, 2025, Biohaven announced that a Phase 2 clinical trial evaluating BHV-7000 for the treatment of major depressive disorder had failed to meet its primary endpoint, and the Company indicated that it would discontinue further psychiatric clinical trials of the drug. These disclosures confirmed that Biohaven's lead pipeline programs lacked the clinical efficacy and regulatory viability that Defendants had repeatedly represented to investors throughout the Class Period.

30. Biohaven released this information after the market had closed early for the Christmas Eve holiday. As investors digested the disclosure and subsequent media coverage, including a January 2, 2026 article by Fierce Biotech reporting that BHV-7000 had failed its Phase 2 trial in major depressive disorder and that Biohaven would discontinue further psychiatric development of the drug, Biohaven's stock price declined further. Biohaven's stock price fell 3.99% from its previous close of $11.29 to $10.84 on January 2, 2026, and declined an additional 8.39% to close at $9.93 per share on January 5, 2026.

31. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Biohaven's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

32. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

34. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Biohaven's principal executive offices are located in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

35. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

36. Plaintiff, as set forth in the certification previously filed with the Court (*see* ECF No. 15-6), acquired Biohaven securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

37. Defendant Biohaven is organized under the laws of the British Virgin Islands with principal executive offices located at its wholly owned subsidiary Biohaven Pharmaceuticals, Inc.,

215 Church Street, New Haven, Connecticut 06510. Biohaven's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "BHVN."

38. Defendant Vlad Coric ("Coric") has served as Biohaven's Chief Executive Officer at all relevant times.

39. Defendant Matthew Buten ("Buten") has served as Biohaven's Chief Financial Officer at all relevant times.

40. Defendants Coric and Buten are collectively referred to herein as the "Individual Defendants."

41. The Individual Defendants possessed the power and authority to control the contents of Biohaven's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Biohaven's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Biohaven, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

42. Biohaven and the Individual Defendants are collectively referred to herein as "Defendants."

## CONFIDENTIAL WITNESSES

43. Confidential Witness ("CW") 1 worked at Biohaven as a senior clinical development employee, and in that role oversaw BHV-7000 development programs for psychiatric indications from 2020 through May 2025.

44. CW2 worked a regulatory associate at Biohaven from October 2024 to July 2025, and reported to the Senior Associate of Regulatory Operations, who reported to the Vice President of Regulatory Affairs. CW2 assisted with the preparing of the documents to be submitted to the FDA as part of the resubmission of the troriluzole NDA, and as part of that role received reports regarding troriluzole study results.

## SUBSTANTIVE ALLEGATIONS

### Background

45. Biohaven is a biopharmaceutical company that discovers, develops, and seeks to commercialize therapies for immunology, neuroscience, and oncology. Biohaven was incorporated on May 2, 2022 in anticipation of Pfizer Inc.'s acquisition of the Company's former parent company, Biohaven Pharmaceutical Holding Company Ltd. (the "Biohaven Parent"). Prior to its acquisition by Pfizer, the Biohaven Parent focused on migraine therapies like Nurtec ODT (rimegepant). On October 3, 2022, Biohaven was spun off from the Biohaven Parent through a distribution of Biohaven's shares to the Biohaven Parent's shareholders as part of the Pfizer acquisition (the "Spin-Off") and began trading on the NYSE on October 4, 2022. Biohaven retained its pipeline of experimental neuroscience drug candidates, including platforms for epilepsy, OCD and spinal muscular atrophy.

46. Biohaven is a clinical-stage company whose business model depends on the successful development and regulatory approval of its investigational drug candidates. As of the

end of 2024, Biohaven had no product candidates approved for marketing in the United States or any other jurisdiction and had never commercialized a product candidate**.** *See* Biohaven Ltd., Form 10-K for the fiscal year ended December 31, 2024 ("2024 10-K").

47. Biohaven has a limited operating history and has incurred significant operating losses since inception; it reported net losses of approximately $846.4 million (2024), $408.2 million (2023), and $570.3 million (2022) and an accumulated deficit of approximately $1.35 billion as of December 31, 2024. *Id.*

48. Biohaven's 2024 10-K described troriluzole (previously known as trigriluzole and BHV-4157) as the most advanced product candidate from its glutamate receptor antagonist (glutamate modulation) platform and BHV-7000 (formerly known as KB-3061) as the "lead asset from the Kv7 platform." *Id.* During the Class Period, the regulatory and clinical prospects of Biohaven's pipeline assets—particularly troriluzole and BHV-7000— were widely viewed by investors and industry analysts as key drivers of Biohaven's business prospects and valuation. Indeed, the Company's 2024 10-K stated:

> Our current business depends entirely on the success of a limited number of product candidates, which are in clinical development. If we do not obtain or are delayed in obtaining regulatory approval for and successfully commercialize one or more of our product candidates, our business, financial condition and results of operations could be materially impacted and we may never become profitable.

49. Given that Biohaven had no approved products and depended entirely on the success of its clinical-stage pipeline, the development and regulatory progress of its lead drug candidates were critical to the Company's financial prospects.

50. Prior to the Spin-Off, in May 2022, Biohaven had announced top-line results from Study 206 evaluating the efficacy and safety of its product candidate troriluzole in treating patients

with SCA, which had failed to meet its primary endpoint—namely, the change from baseline to Week 48 on the modified functional Scale for the Assessment and Rating of Ataxia ("f-SARA")[2].

51. Biohaven's describes SCA as follows:

> Spinocerebellar Ataxias ("SCAs") are a group of ultra-rare, dominantly inherited neurodegenerative disorders predominantly characterized by atrophy of the cerebellum, brainstem, and spinal cord. The disease course of SCA is one of relentless progression over years and inevitably leads to clinical deterioration of motor function, gait imbalance with frequent falling, severe speech impairment, swallowing difficulties, and premature death. SCAs are thought to be pathogenetically related but disease course and brain region involvement are known to vary between the different genotypes. SCA3, also known as Machado-Joseph disease, is the most common genotype, with a prevalence of up to 6,000 in North America and 4,600 in the European Union ("EU") and Japan, and accounts for approximately 30% to 50% of SCAs worldwide. Currently, there are no approved symptomatic or neuroprotective treatments for SCA.

52. Spinocerebellar ataxia is not a single disease but rather a group of genetically distinct neurodegenerative disorders caused by mutations in different genes, each of which is commonly referred to as a separate "genotype" (e.g., SCA1, SCA2, SCA3, SCA6, SCA7, SCA8, and others). Patients with different SCA genotypes may exhibit varying disease progression patterns, clinical manifestations, and responses to potential therapies. Consistent with this scientific reality, Biohaven's pivotal Phase 3 trial of troriluzole (Study 206) enrolled patients with multiple SCA genotypes, including SCA1, SCA2, SCA3, SCA6, SCA7, SCA8, and SCA10.

53. Study 206's prespecified primary endpoint evaluated the treatment effect across the overall study population. According to the Company, Study 206's primary endpoint had failed to reach statistical significance in the overall SCA population because there was purportedly less than expected disease progression over the course of the study. When Study 206 failed to achieve

[2] Biohaven describes the f-SARA scale in its SEC filings as "a novel, 16-point scale developed in collaboration with FDA and key opinion leaders as the primary outcome measure for this trial; the scale was designed to limit subjectivity of the scale and focus on functional aspects of the disease so that significant changes would reflect a clinically meaningful change in function."

statistical significance on that primary endpoint, Defendants shifted their focus to post-hoc subgroup analyses suggesting potential benefit among patients with just the SCA3 genotype—the most common form of SCA—even though such subgroup findings were exploratory and were not the prespecified basis for demonstrating efficacy.

54. Nevertheless, at all relevant times, Defendants continued to consistently tout troriluzole's purported viability and regulatory prospects as a treatment for SCA based on these post-hoc analyses and additional data.

55. Under FDA regulations, evidence of effectiveness for approval of a new drug generally must be derived from adequate and well-controlled clinical trials demonstrating statistically significant improvement on prespecified endpoints. Accordingly, the failure of Study 206 to meet its primary endpoint raised significant regulatory uncertainty regarding whether troriluzole could satisfy the FDA's statutory standard for approval.

56. Moreover, Biohaven's regulatory strategy for troriluzole relied heavily on post-hoc analyses of the failed Phase 3 trial and comparisons to external natural-history datasets rather than on a successful randomized controlled trial demonstrating efficacy on a prespecified primary endpoint. Such approaches are generally subject to heightened scrutiny by the FDA because they may introduce bias, confounding variables, and other methodological limitations that can undermine the reliability of efficacy conclusions.

57. During the Class Period, Defendants likewise touted Biohaven's Kv7 ion channel activator platform, including BHV-7000, the Company's lead asset from the Kv7 platform for the treatment of, among other things, neuropsychiatric conditions including bipolar disorder and MDD.

58. Kv7 channels are potassium ion channels that help control how easily neurons fire. In the brain, the Kv7.2 and Kv7.3 subtypes are major components of the neuronal "M-current," a potassium current that helps stabilize the cell's electrical state and limits repetitive firing. In practical terms, these channels act as a type of brake on neuronal excitability. When Kv7.2/7.3 function is reduced, neurons can become abnormally overactive, a phenomenon associated with seizure disorders. For that reason, drugs that activate Kv7.2/7.3 channels have been investigated primarily as treatments for epilepsy and other disorders involving excessive neuronal firing.

59. According to the Company, "preclinical and pilot clinical data [] suggest[ed] a potential therapeutic role for Kv7 activation in bipolar disorder" and "[r]ecent randomized, controlled clinical trials of Kv7 activators demonstrated efficacy in MDD" that "coupled with the favorable clinical safety and tolerability profile exhibited by BHV 7000 to date, provide a compelling rationale for the evaluation of Kv7 activation with BHV-7000 in MDD." *See, e.g.,* 2024 10-K.

60. As with Biohaven's other clinical-stage programs, the regulatory viability of BHV-7000 depended on demonstrating statistically significant clinical improvement in adequate and well-controlled trials for the relevant indication. Accordingly, the success or failure of Biohaven's clinical trials evaluating BHV-7000 for neuropsychiatric conditions, including bipolar disorder and major depressive disorder, was critical to the drug's development prospects and to investors' assessment of Biohaven's pipeline.

**The FDA Approval Process**

61. Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), the FDA is tasked with ensuring that drugs and devices are safe and effective for their intended uses. 21 U.S.C. §§ 351-360.

62. Companies seeking to begin a clinical investigation of a new drug must submit an Investigational New Drug Application ("IND") to the FDA. 21 C.F.R. § 312.20. The IND application would contain, inter alia, information pertaining to the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product.[3] This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.[4] An IND goes into effect 30 calendar days after FDA receives the IND, unless the FDA places the IND on a clinical hold (21 CFR 312.40(b)). If the FDA does not place a clinical hold, then clinical trials can commence.

63. A clinical investigation is generally divided into three phases, though there is the potential for certain phases to overlap. *See* 21 C.F.R. § 312.21. Phase 1 includes the initial introduction of the drug into humans, and generally involves 20 to 80 patients. 21 C.F.R. § 312.21(a). The goals of Phase 1 are to determine the most frequent side effects, and how the drug is metabolized and excreted. These goals include pharmacokinetic and, where appropriate, pharmacodynamic assessments. Phase 2 includes controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication in patients with the disease or condition under study and generally involves no more than several hundred subjects. 21 C.F.R. § 312.21(b). Phase 3 includes expanded controlled and uncontrolled trials performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and usually includes several hundred to several thousand subjects. 21 C.F.R. § 312.21(c).

64. After the three clinical trial phases are complete, a sponsor may request a "pre-NDA meeting" with FDA prior to submission of an NDA to exchange information about the

[3] https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.
[4] *Id.*

proposed drug marketing application. 21 C.F.R. § 312.47(b)(2). This pre-NDA meeting provides an opportunity for the sponsoring company to: [1] "uncover any major unresolved problems," [2] "identify those studies that the sponsor is relying on as adequate and well-controlled to establish the drug's effectiveness," [3] "identify the status of ongoing or needed studies adequate to assess pediatric safety and effectiveness," [4] "acquaint FDA reviewers with the general information to be submitted in the marketing application (including technical information)," [5] "discuss appropriate methods for statistical analysis of the data," and [6] "discuss the best approach to the presentation and formatting of data in the marketing application." 21 C.F.R. § 312.47(b)(2).

65. Once a pre-NDA meeting is held, the sponsoring company may then formally request FDA approval of a drug for marketing in the United States through submission of an NDA. 21 C.F.R. § 314.50.

66. In 1984, Congress passed The Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments") to the FDCA, Pub. L. No. 98–417, 98 Stat. 1585 (1984). The Hatch-Waxman Amendments were intended to balance the competing interests in the pharmaceutical industry of inducing pioneering research and development of new drugs, and to enable competitors to bring low-cost, generic copies of those drugs to market.

67. The Hatch–Waxman Amendments require drug manufacturers seeking to market a new drug to first obtain FDA approval via one of three different application pathways: (1) a full NDA or 505(b)(1) NDAs; (2) an Abbreviated New Drug Application ("ANDA") or 505(b)(j) ANDA; or (3) an intermediate process known as a Section 505(b)(2) NDA.

68. Under the Federal Food, Drug, and Cosmetic Act and FDA regulations, an applicant seeking approval of a new drug must provide "substantial evidence" of effectiveness derived from "adequate and well-controlled investigations[.]" 21 C.F.R. § 314.126; *see also* 21 U.S.C. § 355(d).

FDA's regulations specify that adequate and well-controlled studies ordinarily require prespecified objectives and endpoints, appropriate control groups, and methods to minimize bias so that the observed effect can be attributed to the drug. 21 C.F.R. § 314.126(b). These requirements form the central framework by which FDA evaluates whether clinical trial data are sufficient to support approval of a new drug application.

69. FDA has issued guidance describing the circumstances under which real-world data ("RWD") and real-world evidence ("RWE") may be used to support regulatory decision-making, emphasizing that FDA evaluates whether such data are sufficiently reliable and relevant for the regulatory question at issue. U.S. Food & Drug Admin., *Considerations for the Use of Real-World Data and Real-World Evidence to Support Regulatory Decision-Making for Drug and Biological Products* (2023). An RWE study is very different than a randomized, well-control clinical trial that is usually used to prove effectiveness of a new drug in a NDA submission because RWE studies analyze data generated outside clinical trials, typically from patient registries and other databases that maintain health information for large groups of patients. FDA's effectiveness guidance stresses that prespecified endpoints, appropriate control comparisons, and methods to address bias are critical when determining whether evidence demonstrates effectiveness. *See* U.S. Food & Drug Admin., *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (1998). External control arms and observational comparisons, including those relying on matching methods, are subject to potential confounding and bias that must be carefully evaluated before such data can support approval.

70. Significantly, while RWE studies have been used to support randomized, well-controlled clinical trials in a limited number of successful NDAs or to expand drug labels, FDA's

data does not show any drug approvals based solely on RWE. https://www.fda.gov/science-research/real-world-evidence/fda-use-real-world-evidence-regulatory-decision-making.

71. Before undertaking a full substantive review of a new drug application, FDA conducts a threshold filing review to determine whether the application is sufficiently complete to permit review. *See* 21 C.F.R. § 314.101(a). If FDA determines the application is incomplete or otherwise unsuitable for review, the agency may issue a Refuse-to-File ("RTF") letter explaining the deficiencies. *Id.* § 314.101(d). Following an RTF decision, the applicant may request an informal conference with FDA within 30 days to address the identified deficiencies. *Id.* FDA guidance further explains that such post-RTF meetings are typically handled as "Type A" meetings intended to address stalled development programs and significant disputes regarding development or approval. U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products* (2017).

72. The FDA has 60 days after an NDA is received to decide whether to file (i.e. accept) the NDA for review. 21 C.F.R. § 314.101(a). The FDA's determination to accept an NDA for review simply means it has determined that the NDA is sufficiently complete to permit a substantive review. *Id.* It does not constitute a determination, preliminary or otherwise, as to the sufficiency of the data therein. Where the FDA finds no basis to refuse the filing of an NDA, the FDA will file the NDA for substantive review. 21 C.F.R. § 314.101(a), (a)(2). Once the review is complete, the FDA will either approve the NDA or issue a complete response letter rejecting the application. 21 C.F.R. § 314.110(a). The FDA will only approve an NDA after determining that the drug meets statutory standards for safety and effectiveness, that the methods, facilities, and controls used for manufacture comply with cGMP, and that the proposed labeling is adequate. 21 C.F.R. §§ 314.105(c); 314.125(b)(1), (b)(13).

73. FDA regulations provide that sponsors may request formal meetings with the agency, including Type A meetings intended to address critical path issues such as dispute resolution following an RTF decision. *See* 21 C.F.R. § 312.47; FDA, *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products* (2017). Type A meetings are typically scheduled within approximately 30 days of the written request and are reserved for stalled programs or issues requiring immediate attention.

74. Once the FDA has accepted an NDA, it may refuse to approve it for a variety of substantive reasons. If the FDA determines that it will not approve an NDA in its present form, it will send the applicant a Complete Response Letter ("CRL") that describes the deficiencies in the application and, where possible, provides recommendations for achieving approval.

**Troriluzole**

75. Glutamate is the principal excitatory neurotransmitter in the human brain and is present at most excitatory synapses in the central nervous system. Excessive glutamate activity can damage neurons through a process known as excitotoxicity, which has been implicated in several neurodegenerative disorders, including amyotrophic lateral sclerosis ("ALS") and certain forms of SCA. Troriluzole is a prodrug that is converted in the body into riluzole, an FDA-approved drug for ALS that modulates glutamatergic signaling in the brain, including by reducing presynaptic glutamate release and altering glutamate transmission. Biohaven developed troriluzole to modulate glutamate signaling in the central nervous system, a mechanism the Company hypothesized could affect disease progression in disorders such as SCA.

76. Defendants pursued regulatory approval of troriluzole utilizing the Section 505(b)(2) of the FDCA pathway. Sponsors submit NDAs pursuant to Section 505(b)(2) when seeking approval of a drug that relies in part on investigations not conducted by or for the applicant

and for which the applicant has not obtained a right of reference. *See* 21 C.F.R. § 314.54. Biohaven's clinical program for troriluzole is based on a regulatory pathway under Section 505(b)(2) that permits reference to FDA's prior findings regarding riluzole for purposes of safety assessment.

77. Notwithstanding reliance on prior clinical or regulatory findings, a Section 505(b)(2) application must still contain the full reports of investigations necessary to demonstrate that the drug is safe and effective for the conditions of use prescribed, recommended, or suggested in the proposed labeling. *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.54. Although a 505(b)(2) applicant may reference FDA's prior findings for an approved drug, FDA must independently determine—based on the totality of the submitted evidence—that the application satisfies the statutory "substantial evidence" standard for effectiveness. *See* 21 U.S.C. § 355(d); 21 C.F.R. § 314.126. Thus, reliance on prior riluzole data did not relieve Biohaven of its obligation to provide adequate and well-controlled evidence demonstrating that troriluzole was effective for the treatment of SCA.

78. Biohaven conducted a clinical development program to evaluate whether troriluzole could slow disease progression in patients with SCA. The centerpiece of this program was Study 206, a randomized, double-blind, placebo-controlled Phase 3 clinical trial designed to assess the safety and efficacy of once-daily oral troriluzole in patients with genetically confirmed SCA. The trial evaluated whether treatment with troriluzole improved or slowed worsening of disease symptoms over a 48-week treatment period, with the primary efficacy endpoint measured by the change from baseline on the f-SARA, a clinical scale commonly used to assess the severity and progression of ataxia symptoms such as coordination, balance, and speech. Demonstrating a statistically significant improvement on this prespecified primary endpoint was critical because

FDA approval of a new drug generally requires evidence of effectiveness derived from adequate and well-controlled clinical investigations showing a meaningful improvement on predetermined clinical outcome measures.

79. Biohaven received a refuse-to-file notice from the FDA for troriluzole in July 2023, citing its inability to achieve statistical significance on the primary endpoint in Study 206. In that trial, treatment with troriluzole produced a mean change difference on the f-SARA of −0.55 compared with placebo at Week 48 (nominal p-value = 0.053), which did not reach statistical significance in the overall study population. The study evaluated multiple genotypes of SCA, a group of rare, primarily inherited neurodegenerative disorders characterized by progressive ataxia resulting from degeneration of the cerebellum, brain stem, and spinal cord.

80. Biohaven subsequently emphasized post-hoc subgroup analyses suggesting statistically significant improvements among certain SCA3 patients—a subset of the overall trial population which tested troriluzole on all SCA genotypes—despite Study 206's failure to meet its prespecified primary endpoint.

81. Following the failed Phase 3 trial and subsequent discussions with the FDA during a Type A meeting, Biohaven pursued an alternative evidentiary approach relying on real-world evidence derived from patients who had continued receiving troriluzole in the open-label extension of Study 206. This analysis, Study 206-RWE, compared disease progression in patients treated with troriluzole over multiple years to progression observed in external "natural history" cohorts of untreated SCA patients drawn from independent observational studies, including the U.S. Clinical Research Consortium for the Study of Cerebellar Ataxia ("CRC-SCA") and the EUROSCA natural history study. Because these external cohorts were not part of the original randomized clinical trial, Biohaven used statistical matching techniques, such as propensity score

matching, to attempt to align treated patients from Study 206 with comparable untreated patients in the natural history datasets based on factors such as genotype, age, baseline disease severity, and other clinical characteristics. The resulting comparisons were intended to estimate whether patients receiving troriluzole experienced slower progression of ataxia symptoms, as measured by changes in the f-SARA, relative to untreated patients observed in these external datasets.

82. Moreover, unbeknownst to investors, and undisclosed throughout the Class Period, the FDA explicitly warned Biohaven that its proposal for Study 206-RWE (externally controlled comparisons using natural history datasets) would "likely be inadequate" to show substantial evidence of efficacy as the primary basis for approval, particularly because Study 206 (what had been randomized, double blind, placebo-controlled) did not meet its prespecified primary endpoint. The FDA also cautioned that analyses relying on external natural-history comparators could be susceptible to bias and confounding because the datasets were collected outside the randomized trial and might differ in ways that could impact disease progression. Consistent with FDA guidance regarding real-world evidence, the agency explained that external data sources must be sufficiently reliable and fit for purpose to address the regulatory question presented.[5]

83. For example, in February 2024, Biohaven held a Type C meeting with the FDA to discuss the Company's proposed RWE analyses evaluating long-term outcomes among patients treated with troriluzole. The discussion focused on analyses comparing patients treated with troriluzole to external natural-history controls to assess efficacy.

84. Following that meeting, the FDA issued official meeting minutes dated March 8, 2024 addressing the proposed RWE study design. In those minutes, FDA expressly cautioned that

[5] U.S. Food & Drug Admin., *Framework for FDA's Real-World Evidence Program* (2018), available at https://www.fda.gov/media/120060/download (explaining that the FDA evaluations whether real world data is reliable and fit for purpose to address the issue under regulatory review).

"a large and robust treatment effect would be needed to overcome the biases of an externally controlled trial, in order for it to be used as the primary basis for substantial evidence for effectiveness." The FDA further provided feedback regarding the study protocol and statistical analysis plan for the RWE analysis before the protocol was finalized and before topline data were analyzed. However, despite providing feedback on the design of the protocol and statistical analysis plan, the FDA simultaneously "continued to express concerns that the post hoc, externally controlled study alone seemed inadequate to demonstrate substantial evidence of effectiveness because the he study would not be blinded or prespecified, would include previously analyzed data, and would be susceptible to residual confounding due to unmeasured differences in subjects from Study 206 compared to the natural history cohorts."

85. The FDA continued to express these concerns to Biohaven at subsequent meetings and regulatory interactions regarding the proposed RWE analysis and its potential use as evidence of effectiveness.

86. Indeed, CW2 recalled multiple communications from the FDA advising Defendants that the study data would not suffice to demonstrate troriluzole's efficacy in treating SCA. According to CW2, Defendant Coric was "very involved" in the resubmission process for the troriluzole NDA, including the process of receiving and responding to feedback from the FDA along with Vice President of Regulatory Marianne Frost, verified that Defendant Coric's name appeared on internal emails regarding the resubmission, and further verified that Defendant Coric's signature appeared on the troriluzole study results.

87. The FDA communications placed Biohaven on notice that the proposed RWE analysis, relying on comparisons between troriluzole-treated patients and external natural-history cohorts, carried inherent methodological limitations and would only support approval if it

demonstrated a sufficiently large and robust treatment effect capable of overcoming those limitations. Accordingly, Defendants knew no later than early 2024 that reliance on externally controlled RWE data posed substantial regulatory risk and that modest or equivocal treatment differences would likely not satisfy the FDA's requirement for "substantial evidence" of effectiveness derived from adequate and well-controlled investigations.

88. Accordingly, as set forth *infra*, at the time Defendants issued the 2023 10-K on February 29, 2024 and subsequently announced the purportedly "positive" topline results from Study 206-RWE in September 2024 (among other misstatements in between and thereafter) and characterized those results as demonstrating a "robust and clinically meaningful slowing of disease progression[,]" Defendants had already received the FDA's express admonition that externally controlled RWE analyses are susceptible to bias and could serve as the primary basis for demonstrating effectiveness only if they produced a sufficiently large and robust treatment effect capable of overcoming the limitations inherent in externally controlled analyses. Despite this, Defendants repeatedly portrayed Study 206-RWE results as definitive evidence of efficacy and emphasized the study's purported alignment with FDA guidance and involvement, thereby creating the misleading impression that the study's design and findings satisfied FDA's evidentiary standards for approval. In reality, Defendants knew or recklessly disregarded that the study's reliance on external natural-history comparators and the magnitude of the reported treatment differences created substantial regulatory risk that the data would not constitute the "substantial evidence" of effectiveness required for approval.

89. In the fourth quarter of 2024, Biohaven resubmitted the troriluzole NDA for the treatment of all SCA genotypes "based upon the topline data from Study BHV4157-206-RWE, and previous safety and efficacy data from the troriluzole development program in SCA…" In

touting the purported strength of the NDA, among other things, Defendants represented that "Troriluzole showed statistically significant superiority across 9 consecutive, prespecified primary and secondary endpoints with highly consistent, sustained, robust and clinically meaningful treatment effects." However, in their prior meetings with Biohaven, the FDA had made clear that the protocol and statistical analysis plan for Study 206-RWE were not "prespecified" and were problematically biased because they were drafted with knowledge of unblinded data from Study 206 and the natural history cohorts and with knowledge of prior matching-adjusted indirect comparison ("MAIC"[6]) results presented in 2023. Moreover, Defendants continued to tell investors that study data had demonstrated "clinically meaningful" slowing of SCA disease progression.

90. Defendants never disclosed that, in fact, the data remained subject to significant methodological limitations and did not demonstrate clinically meaningful efficacy due to numerous deficiencies, including substantial bias and methodological issues. These included, e.g.: (i) twelve of the eighteen "natural history" sites overlapped with Study 206, with unblinded raters assessing both populations; (ii) limited comparability between trial subjects and external controls and residual biases; (iii) substantial amounts of missing outcome data existed in Study 206-RWE; (iv) critical timing discrepancies existed between studies; (v) the primary outcome assessment methodology differed fundamentally between the study populations in Study 206 and CRC-SCA; and (vi) the protocol and statistical analysis plan lacked pre-specification because they were drafted with prior knowledge of the results of the MAIC analysis presented to the FDA in 2023. Despite these known deficiencies, Defendants brazenly told investors that Study 206-RWE was

[6] The MAIC analysis matched natural history subjects to subjects in Study 206.

designed with FDA input, prespecified, and supportive of substantial evidence and near-term commercialization, without disclosing the FDA's contrary feedback.

91. Moreover, Biohaven subsequently highlighted the FDA's acceptance of the NDA for review in February 2025, assuring investors that they had designed Study 206-RWE and the statistical analysis plan "[a]s per instructions from FDA[,]" and further assured investors that they are "prepared to commercialize troriluzole for SCA in the U.S. in 2025."

92. On May 14, 2025, Biohaven issued a press release announcing that the FDA had extended the Prescription Drug User Fee Act ("PDUFA") target action date for the troriluzole NDA by three months to allow additional time for the agency to review materials submitted by the Company in response to information requests from the FDA. The Company further disclosed that the FDA had informed Biohaven that it was planning to convene an advisory committee meeting to discuss the application. Advisory committee meetings are commonly convened when the FDA seeks independent expert input regarding the adequacy of the clinical and scientific evidence supporting a drug application. Accordingly, the extension of the review period and the planned advisory committee meeting indicated that the FDA continued to have concerns regarding the sufficiency of the clinical evidence supporting the application, including the externally controlled real-world evidence analyses on which Biohaven had relied in its resubmission.

93. Nevertheless, following these developments, Defendants continued to reassure investors regarding the strength of the clinical evidence supporting the NDA and the likelihood of approval. Specifically, Defendants emphasized that the resubmitted NDA relied on what they characterized as robust and statistically significant results from Study 206-RWE and reiterated that the study's design and statistical analysis plan had been developed with input from the FDA and were consistent with the agency's guidance regarding the use of RWE. Defendants continued to

describe the study results as demonstrating a "robust" and "clinically meaningful" slowing of disease progression and conveyed to investors that the regulatory pathway remained supported by the "totality of the evidence" generated from Biohaven's clinical development program.

94. On November 5, 2025, Biohaven announced that the FDA had issued a CRL for the troriluzole NDA. In the CRL, the FDA concluded that Biohaven had failed to establish substantial evidence of effectiveness for the treatment of spinocerebellar ataxia. The agency determined that Study 206-RWE did not constitute an adequate and well-controlled investigation capable of supporting approval. The FDA identified several methodological limitations in the analysis, including potential bias arising from differences between treated patients and external control subjects, substantial missing outcome data, differences in the timing and methodology of clinical assessments between datasets, and the lack of prospectively prespecified analyses. The FDA further determined that the magnitude of the observed treatment effect was insufficient to overcome these methodological concerns. As a result, the FDA concluded that the data submitted in support of the NDA did not satisfy the statutory requirement for "substantial evidence" of effectiveness necessary for approval.

**BHV-7000**

95. Biohaven's Kv7 (potassium) ion channel activator platform, the most advanced output of which is BHV-7000. BHV-7000 and the entire Kv7 platform were acquired from privately held Knopp Biosciences ("Knopp") in 2023 for a total upfront consideration of $93.7 million, consisting of cash and legacy Biohaven stock. Additionally, the now amended agreement obligates Biohaven on mid-single digit royalty payments, and in exchange for an $867.5 million reduction in potential milestone commitments down to $270 million ($210 million for BHV-7000),

Biohaven issued Knopp 1.87 million shares of BHVN in mid-2024 and will make another stock issuance worth $75 million in mid-2025.

96. Knopp's subsidiary, Channel Biosciences, developed BHV-7000 as an epilepsy drug. However, according to CW1, epilepsy is a crowded drug market with a number of generics already available on the market. As such, CW1 explained that Biohaven sought to expand possible indications for BHV-7000 beyond epilepsy.

97. During the Class Period, Defendants therefore explored BHV-7000 not only as a treatment for focal epilepsy and generalized epilepsy (though the available data strongly favored use of the drug only for epilepsy),but also for bipolar disorder and MDD across multiple Phase 2 and Phase 2/3 clinical trials. Kv7 is a family (five subtypes) of ion channels that regulate neuronal excitability by controlling the flow of potassium ions across neuronal membranes. Dysfunction of subtypes Kv7.2 and Kv7.3, located primarily in the cortex and hippocampus, can result in seizures.

98. Biohaven described BHV-7000 as a "clinically validated mechanism," and represented that Kv7 activation had potential applications across multiple neurological and neuropsychiatric disorders, including not only epilepsy but neuropsychiatric conditions like bipolar disorder and MDD.

99. Because FDA approval of bipolar disorder treatments ordinarily requires statistically significant improvement over placebo or other control on prespecified clinical endpoints such as the Young Mania Rating Scale ("YMRS") (a clinician-rated scale widely used to measure the severity of manic symptoms in bipolar disorder), the success of Biohaven's pivotal trial evaluating BHV-7000 in acute mania was critical to the drug's regulatory prospects. However, according to CW1 potassium channel activators had never been clinically tested for the treatment

of bipolar mania and no data existed suggesting any efficacy for that indication. As such, CW1 characterized pursuit of clinical testing of BHV-7000 for bipolar mania as "very high risk."

100. FDA approvals for treatments of acute manic episodes associated with bipolar disorder have historically relied on randomized, adequate and well-controlled trials demonstrating statistically significant improvement on prespecified clinical endpoints, most commonly change from baseline on the YMRS over a short-term treatment period of approximately three weeks. Consistent with FDA's general effectiveness framework, demonstration of superiority over control on the prespecified primary endpoint is ordinarily required to support approval. *See* 21 C.F.R. § 314.126; FDA, *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (1998).

101. FDA and related regulatory science frameworks distinguish between biomarkers and clinical endpoints. Biomarkers may provide evidence of biological activity or target engagement but do not themselves establish clinical benefit unless they are validated surrogate endpoints reasonably likely to predict such benefit. Accordingly, evidence of pharmacodynamic or biomarker changes in early-phase studies does not, by itself, establish that a drug will demonstrate clinical efficacy on prespecified endpoints in adequate and well-controlled trials.

102. Because FDA's effectiveness determination focuses on whether a drug demonstrates statistically significant improvement on prespecified clinical endpoints in adequate and well-controlled trials, failure to demonstrate superiority over control on the primary endpoint in a pivotal trial directly implicates whether the program can satisfy FDA's standard for approval. *See* 21 C.F.R. § 314.126; FDA, *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (1998). As explained above, FDA approval of treatments for acute manic

episodes associated with bipolar disorder ordinarily requires randomized, adequate and well-controlled trials demonstrating superiority over control on endpoints such as the YMRS.

103. Throughout the Class Period, Defendants touted biomarker and target engagement signals in early-phase trials as suggestive of efficacy and supportive of BHV-7000's "blockbuster potential" for indications including neuropsychiatric mood disorders. The Company's rationale for these programs was based on the hypothesis that modulation of neuronal excitability through activation of Kv7.2/7.3 potassium channels could influence neural circuits implicated in mood regulation. Consistent with this hypothesis, Biohaven initiated clinical trials evaluating BHV-7000 in patients with acute manic episodes associated with bipolar disorder and in patients with major depressive disorder. These trials were designed to determine whether pharmacologic activation of Kv7 channels would produce measurable clinical improvement in mood symptoms as assessed by established psychiatric rating scales commonly used in regulatory trials for mood disorders.

104. However, the early pharmacodynamic and pilot clinical data cited by Defendants did not establish clinical efficacy and did not demonstrate that BHV-7000 improved clinical symptoms in patients with mood disorders. Instead, the findings consisted of preliminary biomarker and pharmacodynamic observations from early-stage studies, which did not establish that the drug produced therapeutic benefit in patients or that it would succeed on prespecified clinical endpoints in adequate and well-controlled trials required for regulatory approval. Nevertheless, Defendants repeatedly portrayed these preliminary biomarker findings, including the EEG-based observations highlighted in Company disclosures, as evidence supporting the clinical potential of BHV-7000 for mood-disorder indications.

105. On March 3, 2025, Biohaven disclosed that a clinical trial evaluating BHV-7000 for the acute treatment of manic episodes associated with bipolar disorder had failed to meet its

primary efficacy endpoint, as the drug did not statistically separate from the comparator arm on improvement from baseline to Day 21 on the YMRS.

106. Despite this negative result, Defendants continued to assure investors that BHV-7000 remained a promising therapy and emphasized that the drug could still be pursued for other neuropsychiatric indications, including major depressive disorder. In doing so, Defendants failed to disclose that the bipolar trial failure materially increased the risk that BHV-7000 would also fail to demonstrate clinical efficacy in other mood-disorder indications evaluated using similar clinical trial designs and symptom-rating endpoints.

107. The risks associated with BHV-7000's neuropsychiatric development program materialized on December 24, 2025, when Biohaven announced that a Phase 2 proof-of-concept clinical trial evaluating BHV-7000 for the treatment of MDD had failed to meet its primary endpoint of reducing depressive symptoms as measured by change from baseline on the Montgomery-Åsberg Depression Rating Scale ("MADRS") compared with placebo. Although the Company highlighted certain subgroup trends, Biohaven acknowledged that the results did not support the efficacy of BHV-7000 in a broad population of depressed patients and announced that it would discontinue further psychiatric clinical trials of the drug. This disclosure confirmed that BHV-7000 had failed to demonstrate clinical efficacy across multiple mood-disorder indications despite Defendants' repeated representations during the Class Period that early biomarker data and mechanistic hypotheses supported the drug's therapeutic potential. Indeed, Defendants made clear that following the disastrous bipolar and MDD study results, Biohaven would abandon efforts to pursue FDA approval of BHV-7000 for any neuropsychiatric indication. The Company's rationale for these programs was based on the hypothesis that modulation of neuronal excitability through activation of Kv7.2/7.3 potassium channels could influence neural circuits implicated in mood

regulation. Consistent with this hypothesis, Biohaven initiated clinical trials evaluating BHV-7000 in patients with acute manic episodes associated with bipolar disorder and in patients with major depressive disorder. These trials were designed to determine whether pharmacologic activation of Kv7 channels would produce measurable clinical improvement in mood symptoms as assessed by established psychiatric rating scales commonly used in regulatory trials for mood disorders.

108. However, the early pharmacodynamic and pilot clinical data cited by Defendants did not establish clinical efficacy and did not meaningfully support the likelihood that BHV-7000 would meet this regulatory standard because such early-phase findings did not demonstrate that BHV-7000 improved clinical symptoms in patients with mood disorders or would succeed on prespecified clinical endpoints in adequate and well-controlled trials.

109. Following the bipolar and MDD study results, Biohaven indicated that it would discontinue efforts to pursue psychiatric indications for BHV-7000 altogether.

**Materially False and Misleading Statements Issued During the Class Period**

110. The Class Period begins on March 24, 2023. On March 23, 2023, during after-market hours, Biohaven issued a press release reporting its Q4 and FY 2022 financial results and recent business developments. Regarding troriluzole, the press release stated, in relevant part[7]:

> In May 2022, the Company reported top-line results from a Phase 3 clinical trial evaluating the efficacy and safety of its investigational therapy, troriluzole, in patients with [SCA]. ***While the primary endpoint, did not reach statistical significance in the overall SCA population . . . post hoc analysis of efficacy measures by genotype suggested a treatment effect in patients with the SCA Type 3 (SCA3) genotype.***

111. The foregoing statements were false and misleading when made because, although Defendants acknowledged that Study 206 did not achieve statistical significance on its primary endpoint, they nevertheless portrayed post-hoc subgroup analyses as evidence that troriluzole was

[7] All emphasis in both bold and italics hereinafter is added unless otherwise indicated.

efficacious in patients with the SCA3 genotype and as support for the drug's regulatory prospects. In reality, the cited post-hoc findings did not constitute reliable evidence of clinical efficacy and did not establish the "substantial evidence" of effectiveness required for approval under FDA standards, particularly where the prespecified primary endpoint of the randomized Study 206 had failed. By emphasizing exploratory subgroup results while omitting the significant methodological limitations associated with such analyses and the resulting regulatory uncertainty, Defendants created the misleading impression that the clinical data meaningfully supported the likelihood that troriluzole could obtain FDA approval for the treatment of SCA.

112. Also on March 23, 2023, during after-market hours, Biohaven filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2022 (the "2022 10-K"). Notwithstanding the failure of Study 206 to meet its primary endpoint, the 2022 10-K assured investors, in relevant part:

> Post hoc analysis of efficacy measures by genotype suggests a treatment effect in patients with the [SCA3] genotype, which represents the most common form of SCA and accounted for 41% of the study population.
>
> * * *
>
> Across all SCA genotypes, and SCA3 specifically, patient reported falls, as measured by adverse events, reveal reductions of fall risk in the troriluzole group compared to the placebo.
>
> The risk reduction of falls in the troriluzole group combined with the progression of f-SARA scores in the untreated SCA3 group compared to SCA3 patients on troriluzole demonstrates that SCA3 patients experienced a clinically meaningful improvement in ataxia symptoms on troriluzole treatment. ***Given these findings and the debilitating nature of SCA, we intend to interact with the FDA and/or [EMA] in the first half of 2023.*** We have not yet decided on the format of such a regulatory interaction but we could seek advice through various formal or informal interactions with regulatory agencies ***or we could choose to submit an NDA if we believe that is warranted from the results of our ongoing post-hoc analyses***.

113. Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified, in relevant part, that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

114. The foregoing statements were false and misleading when made because, although Defendants acknowledged that Study 206 did not achieve statistical significance on its prespecified primary endpoint, they nevertheless characterized post-hoc subgroup analyses and exploratory fall-risk observations as demonstrating that troriluzole produced a "clinically meaningful improvement" in ataxia symptoms and as supporting potential regulatory submission. In reality, the cited post-hoc analyses and adverse-event fall data were exploratory findings derived from a failed randomized trial and did not constitute reliable evidence of clinical efficacy or the "substantial evidence" of effectiveness required for approval under FDA standards. By portraying these exploratory findings as demonstrating meaningful clinical benefit and suggesting that the data could support a regulatory submission, Defendants created the misleading impression that the Study 206 results meaningfully established the efficacy of troriluzole for SCA3 and provided a viable pathway to regulatory approval, when in fact the underlying data did not demonstrate efficacy and posed substantial regulatory risk that any application would not be accepted for review or approved.

115. On May 31, 2023, Biohaven issued a press release providing an overview of its clinical progress, regulatory updates, and pipeline developments, including, *inter alia*, its submission of the troriluzole NDA with the FDA. The press release stated, in relevant part:

- NDA supported by consistent treatment benefits observed in patients with genotype SCA3 in Study BHV4157-206 across multiple outcome measures

including the change from baseline f-SARA at Week 48, CGI-I total score at Week 48, and a robust reduction in fall risk over the study period. A rigorous analysis by genotype was possible as patients were randomized by genotype strata at baseline prior to randomization in the pivotal Phase 3 48-week, double-blind, placebo-controlled phase of Study BHV4157-206.

- SCA3 represented 41% of study participants, consistent with being the most common subtype. SCA3 affects approximately 10,600 people in North America and in the EU and Japan.
- NDA further supported by a composite scale development (SCACOMS) and analysis of Study BHV4157-206, and confirmatory evidence of efficacy provided by data from the 3-year, long-term open-label (OLE) extension phase of two studies (BHV4157-206 and BHV4157-201) using a Matching Adjusted Indirect Comparison (MAIC) to an external control group.

116. The same press release also quoted Defendant Coric as stating, in relevant part:

> The NDA we submitted for troriluzole for SCA3 represents approximately seven years of effort by the Biohaven team to bring forward a potentially new treatment for this ultra-rare disease . . . . The Biohaven clinical trials in SCA were a first of its kind in this area and utilized a newly developed rating scale (the functional SARA or f-SARA) that was developed in close consultation with the FDA using standard regulatory pathways to elucidate this new scale. We look forward to interactions with the US FDA, EMA and other regulatory agencies across the globe as our submissions advance in the review process[.]

117. The foregoing statements were false and misleading when made because, although Defendants represented that the NDA for troriluzole was supported by "consistent treatment benefits" and "confirmatory evidence of efficacy[,]" the underlying data from Study 206 did not establish clinical efficacy in an adequate and well-controlled trial. As Defendants knew or recklessly disregarded, Study 206 had failed to achieve statistical significance on its prespecified primary endpoint, and the purported evidence cited in support of the NDA consisted primarily of post-hoc subgroup analyses and exploratory comparisons to external or natural-history data. Such analyses are inherently susceptible to bias and do not constitute the "substantial evidence" of effectiveness required for regulatory approval under FDA standards. By portraying these exploratory findings as confirmatory evidence of efficacy and as sufficient support for regulatory approval, Defendants created the misleading impression that the clinical data demonstrated that

troriluzole was efficacious for SCA and that the NDA submission had a meaningful likelihood of approval.

118. With respect to BHV-7000, the May 2023 press release stated, in relevant part:

> Released additional data from Kv7 platform, including Phase 1 safety data by dose groups for BHV-7000 that further validates differentiated profile … Highlighted progress and broad potential of Kv7 platform, including ongoing and planned development of BHV-7000 (Kv7.2/3 activator) ... Burgeoning evidence for therapeutic benefits of targeting Kv7 in diverse, high unmet need

119. The foregoing statements were false and misleading when made because they portrayed a Phase 1 study in healthy volunteers as "burgeoning evidence" supporting the therapeutic potential of BHV-7000 for neuropsychiatric disorders, including bipolar disorder, though biomarker activity cannot measure clinical improvement and is not evidence of therapeutic efficacy. By emphasizing that the study demonstrated a "differentiated profile[,]" Defendants conveyed the misleading impression that the data reflected meaningful clinical activity relevant to psychiatric disease. Defendants misled investors regarding the significance of the data and the likelihood that BHV-7000 would demonstrate clinical benefit in later-stage trials.

**The Truth Begins to Emerge**

120. On July 27, 2023, during pre-market hours, Biohaven issued a press release providing a preliminary electroencephalogram ("EEG") data update for its Kv7 platform, including BHV-7000 as a treatment for bipolar disorder, as well as a regulatory update on the troriluzole NDA (the "July 2023 Press Release"). That press release disclosed, *inter alia*, that the FDA had rejected the troriluzole NDA, refusing even to review the application because Study 206 had failed to meet its primary endpoint:

> **On its SCA program, the FDA informed Biohaven that it would not review the recently submitted NDA application for troriluzole given that the study's primary endpoint was not met and thus, would not permit a substantive review. The communication from the FDA indicated that the Company may request a Type A meeting within 30 days.** Biohaven is committed to working

> closely with the FDA to bring troriluzole to people with SCA3 as quickly as possible given no therapy is currently approved for this ultra-rare genetic disorder and is requesting a Type A meeting to comprehensively address FDA's concerns cited in the refusal to file letter. Any updates regarding the Type A meeting will be provided subsequent to the upcoming regulatory interaction.

121. On this news, Biohaven's stock price fell $5.38 per share, or 22.61%, to close at $18.42 per share on July 27, 2023. Despite this decline in the Company's stock price, Biohaven securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions—namely, with respect to troriluzole's regulatory prospects and/or the data submitted in support thereof as a treatment for SCA, as well as BHV-7000's efficacy and clinical prospects as a treatment for bipolar disorder and MDD.

122. For example, despite the FDA's rejection of the troriluzole NDA, Defendant Coric, as quoted in the July 27, 2023 Press Release, stated in relevant part:

> [W]e believe [all available data for troriluzole] show disease modifying effects for [SCA] . . . . Troriluzole's active metabolite has a known safety profile and is well-tolerated; and, troriluzole was submitted under a 505(b)(2) application with data suggesting an 80% reduction or 7-month benefit in disease progression over the 1-year study period. The risk-benefit profile for troriluzole warranted careful consideration by the FDA for this ultra-rare disorder . . . . Approximately 200 patients have been treated with troriluzole for up to 3 years (whose diagnosis has been confirmed with genetic testing), and the troriluzole treated cohorts have remained stable compared to the untreated natural history cohorts who clearly show marked disease progression over that similar time period . . . . ***We believe the NDA package is compelling and shows that treatment with troriluzole leads to clinically meaningful treatment benefits, including significantly delaying disease progression and reduction in falls. We stand by these data and analyses***.

123. The foregoing statements were false and misleading because the underlying data from Study 206 did not establish clinical efficacy in an adequate and well-controlled trial. As Defendants knew or recklessly disregarded, Study 206 had failed to achieve statistical significance on its prespecified primary endpoint, and the purported evidence cited in support of Defendants'

belief that the "the NDA package is compelling" consisted primarily of post-hoc subgroup analyses and exploratory comparisons to external or natural-history data. Such analyses are inherently susceptible to bias and do not constitute the "substantial evidence" of effectiveness required for regulatory approval under FDA standards. By portraying these exploratory findings as confirmatory evidence of efficacy and as sufficient support for regulatory approval, Defendants created the misleading impression that the clinical data demonstrated that troriluzole was efficacious for SCA and that a future NDA submission would still have a meaningful likelihood of approval.

124. Additionally, with respect to BHV-7000 as a treatment for bipolar disorder, the July 27, 2023 press release stated, in relevant part:

> **Biohaven reported positive, interim data from an [EEG] biomarker study with the initial, low-dose of BHV-7000 studied in healthy volunteers.** Preliminary Phase 1 data confirmed evidence of target engagement in the central nervous system for subjects with projected therapeutic concentrations of BHV-7000 . . . . While additional, higher-dose groups of BHV-7000 are still being evaluated in the EEG analysis, the results from the low-dose group validate the preclinical hypothesis, confirm the Phase 1 SAD/MAD clinical data, and provide strong support for Biohaven's plans to initiate pivotal studies with BHV-7000 in [*Inter Alia*] . . . bipolar disorder . . . . The preliminary data highlight BHV-7000's differentiation and potentially favorable clinical profile[.]

125. The foregoing statements were materially false and misleading because Defendants portrayed preliminary EEG biomarker data from a Phase 1 study in healthy volunteers as evidence supporting the therapeutic potential of BHV-7000 for neuropsychiatric disorders, including bipolar disorder, though they contemporaneously knew that EEG target engagement does not correlate with psychiatric efficacy. By emphasizing that the study demonstrated "evidence of target engagement," "validate[d] the preclinical hypothesis," and "provide[d] strong support" for initiating pivotal studies in bipolar disorder, Defendants conveyed the misleading impression that the data reflected meaningful clinical activity relevant to psychiatric disease. In reality, the study

measured only EEG biomarker changes in healthy volunteers, an early pharmacodynamic signal that does not establish clinical efficacy or demonstrate improvement in psychiatric symptoms. Nevertheless, Defendants further asserted that the "preliminary data highlight BHV-7000's differentiation and potentially favorable clinical profile[,]" thereby implying that the results supported a favorable therapeutic effect for psychiatric indications even though the study did not evaluate patients with those conditions and generated no clinical efficacy data. By presenting preliminary biomarker findings as indicative of a "potentially favorable clinical profile" for bipolar disorder and other psychiatric indications, Defendants misled investors regarding the significance of the data and the likelihood that BHV-7000 would demonstrate clinical benefit in later-stage trials.

126. Indeed, the July 27 Cantor Fitzgerald report confirms the impression the market received from Defendants' misstatements, stating "the results from the low-dose group validate the preclinical hypothesis and bodes well for Biohaven's plans to initiate pivotal studies with '7000 in …bipolar disorder in 2H23," and further stated that "the results presented to date…mechanistically de-risk the compound."

127. On July 31, 2023, Biohaven issued a press release reporting its second quarter ("Q2") 2023 financial results and recent business developments. The press release quoted Defendant Coric as stating, in relevant part:

> I want to reaffirm Biohaven's commitment to the SCA3 patient community in spite of the recent disappointing regulatory decision by the FDA not to review our submitted NDA. Given the seriousness of SCA3 and consistent treatment benefits observed across multiple prespecified outcome measures, including an 80% delay in disease progression over the one-year study period with substantial risk reduction in falls, we believe that full consideration of all available data is warranted for this ultra-rare disease. Biohaven has built its foundation around our patient mission and we plan to continue to work with regulatory agencies to try to advance troriluzole for individuals suffering from SCA3.

128. Also on July 31, 2023, Biohaven filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2023 (the "Q2FY23 10-Q"). The Q2FY23 10-Q stated, *inter alia*:

> In May 2023, the Company presented further analysis of Study BHV4157-206 by prespecified genotype strata that revealed consistent treatment effects of troriluzole in SCA3, the most common genotype worldwide, which represented 41% of study participants. In SCA3 subjects, troriluzole 200mg QD demonstrated benefit on the f-SARA compared with placebo at 48 weeks ... These results were further supported by consistent results across the range of secondary and exploratory endpoints assessed in the SCA3 subgroup. Study BHV4157-206 is an adequate and well-controlled 48-week clinical trial that provides evidence of the efficacy of troriluzole 200 mg once daily in adult SCA3 subjects. Confirmatory evidence of efficacy is provided from several distinct sources ... Given these findings and the debilitating nature of SCA, in May 2023 we announced that we submitted a New Drug Application ("NDA") to the FDA for troriluzole for the treatment of SCA3. In July 2023, the FDA informed us that it would not review the recently submitted NDA application for troriluzole given that the study's primary endpoint was not met and thus, would not permit a substantive review. The communication from the FDA indicated that we may request a Type A meeting within 30 days. Biohaven plans to request a Type A meeting to comprehensively address the FDA's concerns cited in the refusal to file letter. We intend to submit a Marketing Authorization Application ("MAA") to the European Medicines Agency ("EMA") in the second half of 2023.

129. The statements referenced in ¶¶ 127-28 were materially false and misleading because, although Defendants represented that the NDA for troriluzole was supported by "consistent treatment benefits" and "[c]onfirmatory evidence of efficacy," the FDA explicitly told Biohaven that the underlying data from Study 206 did not establish clinical efficacy in an adequate and well-controlled trial. As Defendants knew or recklessly disregarded, Study 206 had failed to achieve statistical significance on its prespecified primary endpoint, and the purported evidence cited in support of the NDA consisted primarily of post-hoc subgroup analyses and exploratory comparisons to external or natural-history data. Such analyses are inherently susceptible to bias and do not constitute the "substantial evidence" of effectiveness required for regulatory approval under FDA standards. By portraying these exploratory findings as confirmatory evidence of efficacy and as sufficient support for regulatory approval, Defendants created the misleading

impression that the clinical data demonstrated that troriluzole was efficacious for SCA and that the NDA submission had a meaningful likelihood of approval.

130. On November 14, 2023, Biohaven issued a press release reporting its third quarter ("Q3") 2023 financial results and recent business developments, including, in relevant part, that the "[EMA] informed the Company that its [MAA] for troriluzole (Dazluma) in the treatment of [SCA] has been validated and is now under review by EMA's Committee for Medicinal Products for Human Use (CHMP)[.]"

131. The foregoing statement was materially false and misleading when made because, while Defendants highlighted that the EMA had "validated" the MAA and initiated review of the application, they failed to disclose that such validation is a largely administrative step that does not reflect any determination by regulators regarding the sufficiency of the clinical evidence supporting the application. At the time, the only pivotal randomized clinical trial evaluating troriluzole for SCA—Study 206—had failed to meet its prespecified primary endpoint, and the purported evidence of efficacy cited by Biohaven consisted primarily of post-hoc subgroup analyses and other exploratory findings that did not constitute reliable evidence of clinical benefit. By emphasizing the EMA's validation of the application and CHMP review without disclosing the significant limitations of the underlying clinical data and the resulting regulatory risk, Defendants created the misleading impression that the troriluzole application had a meaningful likelihood of approval when, in reality, the available clinical evidence did not establish efficacy and posed a substantial risk that regulators would ultimately reject the application.

132. With respect to BHV-7000, the November 11, 2023, press release continued to tout the EEG results and stated that the "Phase 1 EEG biomarker study confirm[ed] CNS activity of BHV-7000 at projected therapeutic concentrations and drug concentration-dependent (i.e., dose-

dependent and time-dependent) changes in EEG spectral power." The press release also quoted Defendant Coric as stating, in relevant part, "we ... shared key data from ongoing studies with BHV-7000, our highly selective Kv7.2/7.3 activator for ... mood disorders ... Consistent with results observed in clinical and non-clinical studies, EEG data reported last month confirmed CNS target engagement."

133. On December 1, 2023, Biohaven issued a press release to announce expanded EEG and safety data for BHV-7000. The press release continued to tout the EEG results and stated that in the "Phase 1 electroencephalogram (EEG) biomarker study, BHV-7000 demonstrated dose-dependent target engagement in the brain as measured by changes in EEG spectral power across all brain regions ... In this Phase 1 study, pharmacodynamic activity of BHV-7000 in the brain of healthy adults was demonstrated by dose-dependent increases in EEG spectral power ... changes in spectral power were observed across all frequency bands with BHV-7000."

134. On January 8, 2024, Biohaven issued a press release reporting the highlights and milestones it presented at the 42nd Annual J.P. Morgan Healthcare Conference. The press release stated that "BHV-7000 is a selective activator of Kv7.2/7.3 potassium channels, a breakthrough target in neurology and neuropsychiatry with blockbuster potential ... clinical proof-of-concept studies have also demonstrated that Kv7 activators have robust antidepressant effects and rapid onset of action, providing strong clinical support for the transformative potential of BHV-7000 as a novel treatment for major depressive disorder."

135. The same press release also quoted Defendant Coric as stating, in relevant part:

> We are very excited about each of these programs with particular emphasis on those with near-term potential, including our selective Kv7 activator platform. We have shown CNS target engagement and differentiated tolerability without the typical CNS side effects of other non-selective agents in this class. Given this remarkable profile, we are advancing BHV-7000 in an array of clinical studies for ... bipolar

> disorder, and major depressive disorder. BHV-7000 has the potential to change the treatment paradigm in mood

136. The statements referenced in ¶¶ 132-35 were materially false and misleading when made because Defendants portrayed BHV-7000 as a highly differentiated and clinically validated therapy with "blockbuster potential" for the treatment of bipolar disorder and other neuropsychiatric conditions based primarily on early-phase biomarker and target-engagement data that cannot and did not establish clinical efficacy even though they knew that no scientific data has ever shown efficacy for potassium channel activators in any kind of mania. Defendants overstated BHV-7000's prospects by representing that these early findings provided strong support for pivotal clinical development of BHV-7000 for bipolar mania while failing to disclose that the available data did not indicate that activation of Kv7.2/7.3 potassium channels would translate into meaningful clinical benefit in patients and that the clinical prospects of BHV-7000 for neuropsychiatric mood disorders were therefore far more attenuated than Defendants claimed.

137. On February 29, 2024, Biohaven issued a press release reporting its Q4 and FY 2023 financial results and recent business developments, including, in relevant part, that the Company "has . . . continued to have constructive dialogue with the FDA regarding its SCA development program and potential future data analyses to address regulatory concerns in the previously issued refuse-to-file decision on its [troriluzole] NDA application for SCA3."

138. The same day, Biohaven filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K continued to tout Biohaven's regulatory advancement of troriluzole for the treatment of SCA with the FDA and EMA, stating, *inter alia*:

> In followup to the [FDA's] regulatory decision on the NDA application, we held followup meetings with the FDA regarding the SCA data. We continue to have constructive dialogue with the FDA regarding our SCA development program and potential future data analyses to address regulatory concerns in the previously

> issued refuse-to-file decision on it's [*sic*] NDA application for SCA3 . . . . In October 2023, the [EMA] informed us that our [MAA] for troriluzole (Dazluma) in the treatment of SCA has been validated and is now under review by EMA's [CHMP].

139. The 2023 10-K also listed Biohaven's "Risk Factors[.]" which were referenced in each quarterly filing throughout the fiscal year and include:

> The regulatory approval processes of the FDA and comparable foreign regulatory agencies are lengthy, time-consuming and unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be materially harmed ... The FDA, EMA, NMPA or any comparable foreign regulatory agency can delay, limit or deny approval of our product candidates or require us to conduct additional preclinical or clinical testing or abandon a program for many reasons, including:
> • the FDA, EMA, NMPA or the applicable foreign regulatory agency's disagreement with the number, design, conduct or implementation of our preclinical studies and clinical trials;
> • negative or ambiguous results from our clinical trials or results that may not meet the level of statistical significance required by the FDA, EMA, NMPA or any comparable foreign regulatory agency for approval
>
> For example, with respect to our randomized, controlled clinical trial of troriluzole for the treatment of SCA, we undertook discussions with the FDA regarding the acceptability of the primary endpoint and necessary secondary endpoints, including our proposal to use a modified SARA scale ... Based on feedback received from the FDA, we incorporated trial design modifications that include utilization of a modified SARA scale. However, notwithstanding the feedback that we have received from the FDA, there remains substantial risk that the FDA or any foreign regulatory agency may nevertheless conclude that results obtained using the modified SARA scale would not be an adequate basis for approval ... Post-hoc analysis of efficacy measures by genotype suggests a treatment effect inpatients with the SCA Type 3 ("SCA3") genotype. There is substantial risk that the FDA, EMA, NMPA or the applicable foreign regulatory agency may disagree with the interpretation of our data, and there can be no assurance that any such regulatory agency will find the data sufficient to support approval, or that we will not be required to conduct additional testing on the safety and efficacy of troriluzole.

140. The statements referenced in ¶¶ 137-39 were materially false and misleading when made because Defendants were aware at that time that the risks had already occurred or would occur and failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—

would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

141. With respect to BHV-7000, the 2023 10-K stated, *inter alia*:

> The preliminary EEG study results confirm the CNS activity of BHV-7000 at projected therapeutic concentrations, dose-dependent and time-dependent changes in EEG spectral power, and are consistent with the quantitative EEG effects observed with other ASMs approved for the treatment of epilepsy. Based on the results from the EEG study and the safety profile in SAD/MAD trials, along with PK data from a new once-daily extended-release ("ER") formulation, Biohaven plans on exploring three oral doses of BHV-7000 (once daily 25 mg ER, once daily 50mg ER, and once daily 75 mg ER) in the Phase 2/3 clinical trials in epilepsy and mood disorders ... The therapeutic role for Kv7 activation in MDD is supported by abroad range of epigenetic, mechanistic, preclinical, and clinical evidence. Multiple depression models have demonstrated the antidepressant efficacy of enhancing potassium channel activity ... Recent randomized, controlled clinical trials of Kv7 activators demonstrated efficacy in MDD. Together, these data, coupled with the favorable clinical safety and tolerability profile exhibited by BHV 7000 to date, provide a compelling rationale for the evaluation of Kv7 activation with BHV-7000 in MDD.

142. Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 113, *supra*, signed by the Individual Defendants.

143. The foregoing statements were false and misleading when made because they portrayed preliminary EEG biomarker data from a Phase 1 study in healthy volunteers as evidence supporting the therapeutic potential of BHV-7000 for neuropsychiatric disorders, including bipolar disorder. Defendants conveyed the misleading impression that the data reflected meaningful clinical activity relevant to psychiatric disease. In reality, the study measured only EEG biomarker changes in healthy volunteers, an early pharmacodynamic signal that does not establish clinical efficacy or demonstrate improvement in psychiatric symptoms. Nevertheless, Defendants further asserted that the "EEG study results confirm the CNS activity of BHV-7000 at projected therapeutic concentrations," thereby implying that the results supported a favorable therapeutic effect for psychiatric indications even though the study did not evaluate patients with those conditions and generated no clinical efficacy data. By presenting preliminary biomarker findings as indicative of a "potentially favorable clinical profile" for bipolar disorder and other psychiatric indications, Defendants misled investors regarding the significance of the data and the likelihood that BHV-7000 would demonstrate clinical benefit in later-stage trials. Defendants also cited to "preclinical, and clinical evidence" and "[m]ultiple depression models" that "demonstrated efficacy in MDD" to "provide a compelling rationale for the evaluation of Kv7 activation with BHV-7000 in MDD."

144. Also, that same day, TD Cowen issued an analyst report with a $55 price target on Biohaven (up from $35) confirming that Defendants' statements successfully assured investors that study data demonstrated troriluzole's efficacy. Specifically, the TD Cowen report stated based on Defendants' representations that:

> In our view, the totality of the data does suggest that troriluzole provides disease stabilization and benefit compared to natural history. Furthermore, the favorable risk/benefit profile due to clean safety warranted consideration by the FDA given that there are currently zero approved options for SCA3 and it often leads to premature disability,

> wheelchair dependence, and death. Biohaven disclosed that it has continued to have a constructive dialogue with the FDA regarding its SCA development program and potential future data analyses to address regulatory concerns in the RTF, and will provide further updates as warranted by positive progress from future regulatory interactions.

145. On May 9, 2024, Biohaven filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2024 (the "Q1FY24 10-Q"). The Q1FY24 10-Q stated, *inter alia*:

> In 2023, we initiated a Phase 1 open-label electroencephalogram ("EEG") study ... BHV -7000 was well-tolerated at all doses studied and EEG data showed dose-dependent increases in brain spectral power, with minimal power increase in the delta frequency band and the highest spectral power increases in the alpha, beta, and gamma frequency bands. The minimal impact of BHV-7000 on slower frequencies (i.e., delta) is consistent with the low incidence of central nervous system ("CNS") adverse events, in particular somnolence, seen in the BHV-7000 Phase 1 SAD/MAD studies, and the study results confirm the CNS activity of BHV-7000 at projected therapeutic concentrations. Based on the results from the EEG study and the safety profile in SAD/MAD trials, along with PK data from a new once-daily extended-release ("ER") formulation, Biohaven plans on exploring three oral dose levels of once-daily BHV-7000 (25 mg, 50 mg, and 75 mg) in the Phase 2/3 clinical trials in epilepsy and mood disorders.

146. The foregoing statements were false and misleading when made because they portrayed preliminary EEG biomarker data from a Phase 1 study in healthy volunteers as evidence supporting the therapeutic potential of BHV-7000 for neuropsychiatric disorders, including bipolar disorder. Defendants conveyed the misleading impression that the data reflected meaningful clinical activity relevant to psychiatric disease. In reality, the study measured only EEG biomarker changes in healthy volunteers, an early pharmacodynamic signal that does not establish clinical efficacy or demonstrate improvement in psychiatric symptoms. Nevertheless, Defendants asserted that the "EEG data showed dose-dependent increases in brain spectral power" and "the study results confirm[ed] the CNS activity of BHV-7000 at projected therapeutic concentrations" thereby implying that the results supported a favorable therapeutic effect for psychiatric indications even though the study did not evaluate patients with those conditions and generated no

clinical efficacy data. By presenting preliminary biomarker findings as evidence supporting the therapeutic potential of BHV-7000 for neuropsychiatric disorders, Defendants misled investors regarding the significance of the data and the likelihood that BHV-7000 would demonstrate clinical benefit in later-stage trials.

147. On May 29, 2024, Biohaven issued a press release providing an overview of its purported development and regulatory advancements across multiple therapeutic areas. With respect to BHV-7000 for the treatment of bipolar disorder and major depressive disorder, the press release stated, in relevant part, that the Company had "[i]nitiated pivotal clinical trials" and that "BHV-7000 offers the potential of a highly differentiated profile, ***having potent efficacy*** without burdensome central nervous system side effects."

148. On the same day, Biohaven presented at its R&D Day. The presentation slides stated, *inter alia*:

> Kv7 is Transformational Target in Neurology and Neuropsychiatry
> • Clinically validated in ... MDD … BHV-7000 is Potential Best-in-Clinic Selective Kv7 Activator with Blockbuster Potential
> • CNS target engagement at predicted therapeutic concentrations confirmed in Phase 1 EEG study
>
> ***
>
> BHV-7000 has ideal profile for MDD due to higher potential dose and lower rates of CNS AEs vs. nonselective Kv7 activators

149. The statements referenced in ¶¶ 147-48 were materially false and misleading when made because Defendants portrayed BHV-7000 as an "ideal profile[,]" with a "highly differentiated[,]" "[p]otential [b]est-in-[c]linic[,]" and "[c]linically validated" therapy with "blockbuster potential" for the treatment of MDD and other neuropsychiatric conditions based primarily on early-phase biomarker and target-engagement data that cannot and did not establish clinical efficacy. Defendants overstated BHV-7000's prospects by representing that these early findings provided strong support for pivotal clinical development of BHV-7000 while failing to

disclose that the available data did not indicate that activation of Kv7.2/7.3 potassium channels would translate into meaningful clinical benefit in patients and that the clinical prospects of BHV-7000 for neuropsychiatric mood disorders were therefore far more uncertain than Defendants claimed.

150. On August 8, 2024, Biohaven issued a press release reporting its second quarter 2024 financial results and recent business developments. The press release stated, in relevant part, that "SCA interactions [regarding the] troriluzole filing in Europe [are] ongoing[,]" and touted purported "constructive interactions in the US with the FDA" as well as a "[n]ew real-world evidence (RWE) protocol, incorporating feedback from the FDA, assessing 3-years of treatment with troriluzole [that is] expected to deliver topline results in [the second half of] 2024[.]"

151. The same press release also quoted Defendant Coric as stating, in relevant part:

> [W]e continue to have constructive dialogue with the FDA regarding our SCA development program and our [EMA] application for SCA3 remains under review. We now expect topline data from a new RWE protocol assessing the efficacy of troriluzole in SCA patients treated for up to 3 years— this includes new patient data that has not previously been available.

152. The next day, on August 9, 2024, Biohaven filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2FY24 10-Q"). The Q2FY24 10-Q stated, *inter alia*:

> As a result of regulatory interactions, Biohaven designed a new protocol to assess the effectiveness of troriluzole after 3 years of treatment in SCA. This new protocol, BHV4157-206-RWE (NCT06529146), uses real world evidence ("RWE") of effectiveness using real-world data ("RWD") sources to examine the treatment effects of troriluzole in SCA after up to 3 years of therapy compared to external control subjects collected from the US SCA Natural History cohort ("CRC-SCA"). The data analysis will incorporate new patient data that was previously unavailable and not analyzed in the prior FDA submission ... The protocol was designed to be consistent with FDA's Guidance for Industry, "Considerations for the Use of Real-World Data and Real-World Evidence to Support Regulatory Decision Making for Drug and Biological Products." The protocol and SAP were submitted and reviewed by FDA prior to database lock of newly available 3-year data. Topline

data from this protocol is expected in the second half of 2024 and, if positive, could form the basis of a new drug application to the FDA.

153. On September 23, 2024, Biohaven issued a press release announcing purported positive results from Study 206-RWE, stating, *inter alia*:

- Troriluzole 200 mg dosed orally, once daily, in patients with SCA met the study's primary endpoint on the change from baseline in the modified [f-SARA] at 3 years in all study population genotypes.
  - Troriluzole also showed statistically significant superiority after both 1 and 2 years of treatment.
- Troriluzole achieved statistically significant superiority on 9 consecutive, prespecified primary and secondary endpoints.
- SCA patients treated with troriluzole showed a 50-70% slowing of disease progression, representing 1.5-2.2 years delay in disease progression over the 3-year study period.

* * *

Collectively, data across multiple analyses demonstrate a robust and clinically meaningful slowing of disease progression in SCA patients.

154. Based on the foregoing purported positive results, the press release likewise touted troriluzole's continued regulatory prospects as a treatment for SCA, as well as Biohaven's planned resubmission of the troriluzole NDA with the FDA, stating, *inter alia*:

> Based upon the topline data from Study BHV4157-206-RWE, and previous safety and efficacy data from the troriluzole development program in SCA, Biohaven plans to submit a[n NDA] to the FDA in Q4 2024. The troriluzole development program has generated the largest clinical trial dataset in SCA and now has follow-up in some patients treated with troriluzole for over 5 years . . . . Biohaven will be prepared to commercialize SCA in the US in 2025[.]

155. Additionally, the same press release quoted Defendant Coric as stating, in relevant part:

> [O]ur SCA development program has provided the first evidence of a clinically meaningful treatment benefit as well as slowing disease progression in SCA patients. We were excited to receive the positive topline results from Study BHV4157-206-RWE, which was designed with FDA input and pursuant to the principles outlined in the FDA's guidance for the use of real-world evidence . . . . We look forward to interacting with regulatory agencies to bring troriluzole to patients with SCA.

156. On the same day, Biohaven held a call to discuss the Study 206-RWE topline pivotal trial results. On the call, Defendant Coric continued to tout the trial's positive results, and stated, *inter alia*:

> The results presented today are extremely clinically meaningful to patients and are consistent with the other benefits of troriluzole that we have shown, including a reduction in risk for falls in SCA patients ... Based upon these topline results, we plan to submit a New Drug Application to the FDA for troriluzole in the treatment of all SCA genotypes by the end of the year ... our commercial team is already preparing for success.

157. During the same call, an analyst questioned Defendant Coric about "FDA next steps[.]" Specifically:

> **Question – Charles C. Duncan**: ... in terms of FDA next steps, would you conduct a pre-NDA meeting or just file an NDA ...
>
> **Answer – Vladimir Coric:** ... to your question, we've already initiated the process to submit our NDA. We have had multiple interactions and discussions with the FDA over the last several months. I think, we weren't able to share those with folks until recently and obviously it is topline data. So given the robustness of those discussions and most importantly this topline data, we've already communicated to the FDA that we will be resubmitting prior to the end of this year. And we're really excited about that and feel an obligation to move quickly since this is a neurodegenerative disorder. And you can see from the data, you must intervene to save neurons as soon as possible in these patients.

158. The statements referenced in ¶¶ 150-57 were materially false and misleading because Defendants presented the results of Study 206-RWE as robust, reliable evidence of troriluzole's clinical efficacy and regulatory viability, but failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline

differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

159. Analyst reports issued following the September 23, 2024 disclosures demonstrate how Defendants' misrepresentations convinced the market that troriluzole had a realistic approval pathway. For example, on that same day, Baird Equity Research issued a report raising its price target to $60 based on Defendants' release of "positive…new data" and representations regarding discussions with the FDA. Indeed, while Baird noted the previous RTF, it found the FDA's involvement reassuring and stated that "Management noted the new study was designed with FDA input, so there is some regulatory buy-in here." The Baird report further stated:

> We think that the stat sig impact across nine consecutive key primary and secondary endpoints can equip the FDA review team and potential AdCom panelists with some additional confidence. Given the success on these endpoints is also under the context of a natural history comparator arm, we think the FDA's stance on the quality of the propensity matching will be crucial in determining the degree to which these contribute to the "totality of evidence" argument.

160. Additionally, William Blair issued a report setting a $77 price target and similarly noting the positive efficacy news from. Specifically, referencing Study 206-RWE, the William Blair report stated in relevant part:

> The study met its primary endpoint of change from baseline in the modified functional Scale for the Assessment and Rating of Ataxia (f-SARA) at 3 years in all study population genotypes compared to untreated patients from the U.S. Clinical Research Consortium for the Study of Cerebellar Ataxia (CRC-SCA) natural history study (exhibit 1). Additionally, troriluzole-treated patients showed statistically significant benefits at years 1 and 2 on the f-SARA compared to the matched natural history control. Troriluzole also achieved statistically significant improvements on 9 consecutive prespecified primary and secondary endpoints, and

> patients treated with troriluzole showed a 50%-70% slowing of disease progression, or approximately 1.5-2.2 years delay in disease progression, over the 3-year study period.

Moreover, William Blair emphasized that, "we are encouraged by the degree FDA guidance was incorporated into the trial design…" and further stated that, "overall, we are encouraged by the consistent signals of benefit across measures in the study…"

161. On November 12, 2024, Biohaven issued a press release reporting its Q3 2024 financial results and recent business developments. In addition to continuing to tout Study 206-RWE's results, the press release quoted Defendant Coric as stating that Biohaven was "encouraged by the robust dataset gathered to date and look[ed] forward to submitting an NDA to the FDA." The press release also assured investors that the study's design, as well as the significance of the study's generated data, were in alignment with the FDA. For example, the press release stated, *inter alia*, that "[b]oth the study protocol and statistical analysis plan were submitted to, and reviewed by, the [FDA] prior to topline data analysis[,]" and that the "[s]tudy [was] designed in discussion with the FDA and utilized Phase 3 data and an external control of matched, untreated SCA subjects from the U.S. Clinical Research Consortium for the Study of Cerebellar Ataxia (CRC-SCA) in accordance with the FDA's Guidance on Real-World Evidence (RWE) of effectiveness[.]"

162. The same press release also assured investors that the troriluzole MAA "remains under review[,]" that "Biohaven completed a clarification meeting with CHMP Rapporteurs in 4Q 2024[,]" and that "MAA documents are being updated to include the new positive BHV4157-206-RWE study data with broader indication to include ***all*** SCA genotypes."

163. Also on November 12, 2024, Biohaven filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024 (the "Q3FY24 10-Q"). The Q3FY24 10-Q stated, *inter alia*:

> In the fourth quarter of 2024, we completed a clarification meeting with the CHMP Rapporteurs. The MAA documents are now being updated with a broader indication to include all SCA genotypes, in light of the new positive BHV4157-206-RWE study data ... In September 2024, we announced positive topline results from pivotal Study BHV4157-206-RWE (NCT06529146) demonstrating the efficacy of troriluzole on the mean change from baseline in the f-SARA after 3 years of treatment. The study achieved the primary endpoint and showed statistically significant improvements on the f-SARA at years 1 and 2 and 3 ... Collectively, data across multiple analyses demonstrate a robust and clinically meaningful slowing of disease progression in SCA patients.
>
> ***
>
> Based upon the topline data from Study BHV4157-206-RWE, and previous safety and efficacy data from the troriluzole development program in SCA, we plan to submit an NDA to the FDA in the fourth quarter of 2024. The troriluzole development program has generated the largest clinical trial dataset in SCA and now has follow-up in some patients treated with troriluzole for over 5 years ... We will be prepared to commercialize SCA in the US in 2025, if ultimately approved, based on potential priority review timelines.

164. The statements referenced in ¶¶ 161-63 were materially false and misleading when made because Defendants continued to invoke the FDA's purported involvement in the design and review of Study 206-RWE to reassure investors that the study satisfied regulatory standards for demonstrating efficacy. In doing so, Defendants reinforced the same misleading impression conveyed in the Company's earlier disclosures—that the study's design and analytical framework were aligned with FDA expectations and capable of supporting regulatory approval. In reality, Study 206-RWE relied on external, non-contemporaneous natural history comparators rather than a randomized or contemporaneous control arm, a design that inherently lacks the methodological safeguards required to produce the "adequate and well-controlled investigations" necessary to establish "substantial evidence" of effectiveness under 21 C.F.R. § 314.126. By emphasizing that the study protocol and statistical analysis plan had been submitted to and reviewed by the FDA and that the study was conducted pursuant to FDA real-world evidence guidance, Defendants conveyed the misleading implication that the agency had endorsed the study's design and

analytical framework as capable of supporting regulatory approval, when in fact the study's methodology was insufficient to satisfy FDA's evidentiary standards for demonstrating drug efficacy.

165. The following day, H.C. Wainwright issued an analyst report with a "Buy" rating and a $59 price target noting, in relevant part:

> Troriluzole had previously failed in this indication, but this time, 200mg troriluzole dosed orally, met the study's primary endpoint on the change from baseline in the f-SARA at 3 years in a cohort of patients with varying SCA genotypes but notably a higher prevalence of SCA3. The study was designed in discussion with the FDA and used an external control of matched, untreated SCA subjects from the US Clinical Research Consortium for the study of Cerebellar Ataxia (CRC-SCA) and the EUROSCA. With quantitative results showing a 60% slowing of disease progression as measured by the change in f-SARA and qualitative improvements such as a significant 53% reduction in fall risk, we believe troriluzole may have real disease-modifying potential.

166. Also on November 13, 2024, William Blair issued an analyst report regarding the positive results Defendants reported for troriluzole, and set an "Outperform" rating. The report emphasized that "Biohaven has specified that both the protocol and [statistical analysis plan] were submitted and reviewed by the FDA prior to database lock of newly available 3-year data."

167. On December 16, 2024, Biohaven issued a press release announcing the purported "achievement of several clinical and regulatory milestones" across its product candidates. In particular, the Company announced that it had resubmitted the troriluzole NDA "to the US FDA for troriluzole in the treatment of ***all*** genotypes of [SCA], following the completion of a pre-NDA meeting in 4Q 2024[,]" while touting the sufficiency of its "recently reported positive topline pivotal results in SCA in September 2024" to support the NDA.

168. The same press release also touted the advancement and clinical prospects of the Phase 2/3 study of BHV-7000 in treating bipolar disorder, stating, *inter alia*:

> Biohaven . . . complet[ed] . . . enrollment in a pivotal BHV-7000 Phase 2/3 trial in bipolar disorder in 4Q 2024. BHV-7000 is a selective activator of Kv7 potassium

> channels that offers a novel and compelling mechanism of action for the treatment of bipolar disorder[.]

169. Following publication of the press release, Piper Sandler issued an analyst report with a $76 price target for Biohaven based in part on Defendants' representations that troriluzole is "on track for a 2025 launch…based on an FDA-aligned real-world evidence (RWE) protocol which showed a 50-70% reduction in disease progression on troriluzole vs. natural history cohorts over 3 years." Crediting management's assurances that Study 206-RWE was "FDA-aligned" and that the data showed a substantial reduction in disease progression, Piper "model[ed] a 2025 launch, with US revenues of $18M, $97M, and $170M for FY2025E-2027E."

170. Similarly, TD Cowen also issued a report on December 16, 2024 with a "Buy" rating and a $75 price target, in part due to Defendants' representations regarding the strength of the troriluzole and their "alignment" with the FDA:

> Recall that in September 2024 Biohaven shared data from its redesigned pivotal study demonstrating that troriluzole hit its primary endpoint of f-SARA change from baseline over 3 years in all study populations in September (link to note here). This came after last year's disappointment when the FDA issued a refuse-to-file letter for troriluzole's NDA application. ***However, the company meticulously followed the FDA's instructions for a revised pivotal trial design, which succeeded across genotypes and study years. Now possessing a strong data package, the company filed an NDA for troriluzole in SCA following completion of pre-NDA meeting in Q4:2024***, so an acceptance could come in the next month or two. Troriluzole qualifies for potential Priority Review, considering its Orphan Drug and Fast-Track designations. If approved, we anticipate a US launch as early as late-2025.

171. On January 13, 2025, Biohaven issued a press release highlighting the purported "broad portfolio progress" of its product candidates. With respect to BHV-7000, the press release stated, in relevant part, that "BHV-7000[, a s]elective activator of Kv7.2/7.3 potassium channels, [is] a breakthrough target in neurology and neuropsychiatry with blockbuster potential" and "a clinically validated target for treating mood disorders[,]" while simultaneously touting the

"[r]egistrational studies [of BHV-7000] ongoing in bipolar disorder [and] major depressive disorder[.] "

172. The foregoing statements, as well as those referenced in ¶ 168 were materially false and misleading when made because Defendants portrayed BHV-7000 as a highly differentiated and "clinically validated" therapy with "blockbuster potential" for the treatment of bipolar disorder and other neuropsychiatric conditions based primarily on early-phase biomarker and target-engagement data that cannot and did not establish clinical efficacy and even though no Kv7 activator had ever demonstrated efficacy in bipolar mania. Defendants overstated BHV-7000's prospects by representing that these early findings provided strong support for pivotal clinical development of BHV-7000 while failing to disclose that the available data did not indicate that activation of Kv7.2/7.3 potassium channels would translate into meaningful clinical benefit in patients, that no data existed suggesting efficacy of potassium channel activators for any kind of mania, and that the clinical prospects of BHV-7000 for neuropsychiatric mood disorders were therefore far more uncertain than Defendants claimed.

173. With respect to troriluzole, the same January 13 press release stated, *inter alia*, that Biohaven is "[p]reparing for commercial launch in SCA in 2025, while awaiting [a] filing decision from [the] FDA on the troriluzole all-genotype SCA NDA resubmission."

174. The foregoing statements as well as those referenced in ¶ 167 were false and misleading when made because Defendants failed to disclose that the FDA had repeatedly informed Defendants during the development and regulatory review of troriluzole that the Company's reliance on Study 206-RWE, an externally controlled comparison of Study 206 participants to natural history cohorts, was unlikely to provide the "substantial evidence of effectiveness" required for approval under 21 C.F.R. §314.126. In particular, the FDA had warned

Biohaven that Study 206-RWE would likely be inadequate as a primary evidentiary basis for approval because the randomized, double-blind Study 206 had failed to achieve statistical significance on its prespecified primary endpoint. The FDA further advised Biohaven that the proposed external control analyses were susceptible to significant bias and confounding, including baseline differences between trial participants and natural history controls, lack of blinding, lack of true prespecification of the statistical analysis plan, and other methodological limitations that would undermine the reliability and interpretability of the results. Despite these warnings, Defendants issued statements designed to assure investors regarding the strength of the troriluzole NDA including that Biohaven was "[p]reparing for commercial launch[.]" In reality, as the FDA ultimately confirmed in its November 5, 2025 Complete Response Letter, Study 206-RWE suffered from bias and fundamental methodological flaws that rendered the study incapable of serving as an adequate and well-controlled investigation and therefore insufficient to establish substantial evidence of effectiveness for troriluzole.

175. Indeed, on January 14, 2025, J.P. Morgan issued an analyst report wherein they described conversations with Biohaven management regarding troriluzole as follows:

> When asked on what gives them confidence that the real-world evidence (RWE) study will be sufficient for a broad label encompassing all SCA genotypes, mgmt reflected back to their early days of interactions with the FDA when it was indicated if their study was positive they would not be limited to genotypes evaluated in the study. Regarding a potential launch (around mid-year according to mgmt), they indicated they are already in planning steps and have a presence at all major academic sites which is where they intend to focus the launch.

176. On February 11, 2025, Biohaven issued a press release announcing that the FDA had accepted the resubmitted troriluzole NDA, stating, *inter alia*:

> [T]he [FDA] has accepted for review the Company's [NDA] for troriluzole for the treatment of adult patients with [SCA] and has granted Priority Review . . . . The FDA's decision regarding the NDA is expected within 6 months of filing (during 3Q2025). Based on FDA Priority Review timelines and if ultimately approved, Biohaven is prepared to commercialize troriluzole for SCA in the US in 2025.

* * *

> The NDA submission was based, in part, on positive topline results from Study BHV4157-206-RWE (NCT06529146), in which troriluzole 200 mg dosed orally in patients with SCA met the study's primary endpoint of change from baseline on the functional [f-SARA], in all SCA genotypes, at 3 years compared to an external control arm. Troriluzole showed statistically significant superiority across 9 consecutive, prespecified primary and secondary endpoints with highly consistent, sustained, robust and clinically meaningful treatment effects. SCA patients treated with troriluzole showed a 50-70% slower rate of decline, representing 1.5-2.2 years delay in disease progression, over the 3-year study period . . . . The NDA also includes confirmatory and supportive data from Studies BHV4157-201 and BHV4157-206, the first large, multi-center registrational trials in SCA. Notably, these data include disease stabilization in the SCA3 genotype . . . and a reduction in falls in all SCA genotypes . . . , both compared to placebo over 48 weeks in Study BHV4157-206.

* * *

> Biohaven's troriluzole clinical development program in SCA collected data over 8 years, including a robust long-term safety profile, and was the first industry trial conducted in SCA. The external control arms used in Biohaven's BHV4157-206-RWE Study were provided from objective, third-party data gathered from two independent natural history cohorts: one in the United States and one in Europe (EUROSCA Natural History Study). The National Ataxia Foundation (NAF) sponsored the Clinical Research Consortium for the Study of Cerebellar Ataxia (CRC-SCA) that served as the basis for the US natural history cohort. The data from the CRC-SCA is managed by the University of South Florida Health Informatics Institute. A total of 35 clinical sites provided data in the US and European natural history cohorts that served as the external controls in BHV4157-206-RWE. , the external control arm was determined using a Propensity Score Matching (PSM) method to ensure that untreated subjects from the comparator natural history cohort were rigorously matched to treated subjects from the troriluzole arm of Study BHV4157-206. PSM was used on all prognostic, demographic, and baseline characteristics known to be associated with disease progression in SCA, including baseline f-SARA, age, sex, age at symptom onset, genotype, and trinucleotide repeat length (by genotype).

177. Buoyed by Defendants' portrayal of the data and constant emphasis of FDA alignment on Study 206-RWE's design, analysts viewed the NDA acceptance as a significant de-risking event. For example, on February 11, 2025, Piper Sandler issued an analyst report with a. $76 price target on Biohaven, and stated the following regarding troriluzole in relevant part:

> ***We like the chances for approval***. Recall that troriluzole's NDA follows a long development journey. After receiving a Refusal To File letter from the FDA due to mixed P3 results, the company, ***with the FDA's blessing***, designed a real world evidence (RWE) protocol which ***showed stat-sig benefit from troriluzole*** at 1, 2, and 3 years of treatment, conferring a 50% slowing of disease progression at 3 years compared to natural history controls. Because of the FDA's recent flexibility, especially with serious neurological conditions with no treatment options like SCA, ***and its apparent blessing on the RWE protocol***, ***we think the chances for approval here are high***.

178. Further on February 11, 2025, William Blair issued a report with an "Outperform" stock rating and "model[ed] an 85% probability of success" for the troriluzole NDA, based on the FDA's acceptance of the NDA filing and Defendants' repeated characterization of the study data's "positive results." Specifically, the report stated in relevant part:

> The company recently announced ***positive results*** from a real-world evidence study in which 200 mg of daily troriluzole ***met the study's primary endpoint*** of change from baseline on the functional Scale for the Assessment and Rating of Ataxia (f-SARA)at 3 years compared to an external control arm. Importantly, ***benefit was seen in all SCA genotypes***. ***Troriluzole also showed statistically significant superiority across 9 consecutive, <u>prespecified</u> primary and secondary endpoints***, including a 50%-70% slower rate of decline, representing a delay of 1.5-2.2 years in disease progression, over the 3-year study period. The NDA also includes confirmatory and supportive data from studies BHV4157-201 and BHV4157-206, the first large, multicenter registrational trials in SCA.
>
> Emphasis added.

179. The statements referenced in ¶ 176 were materially false and misleading when made because Defendants presented the results of Study 206-RWE as robust, reliable evidence of troriluzole's clinical efficacy and regulatory viability, but failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose"

and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

180. On March 3, 2025, during pre-market hours, Biohaven issued a press release reporting its Q4 and FY 2024 financial results and recent business developments. Therein, Biohaven disclosed disappointing results from a "topline analysis of treatment with BHV-7000 in the acute treatment of manic episodes associated with bipolar disorder in a 3-week trial[.]" Specifically, "BHV-7000 did not statistically differentiate from the comparator arm on the primary efficacy endpoint of improvement from Baseline to Day 21 on the Young Mania Rating Scale."

181. On this news, Biohaven's stock price fell $5.12 per share, or 13.77%, to close at $32.06 per share on March 3, 2025. Despite this decline in the Company's stock price, Biohaven securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding: (i) the troriluzole NDA, its regulatory prospects and the data submitted in support of thereof for the treatment of SCA; and (ii) the purported indications of efficacy of BHV-7000 for other mood disorders, including MDD.

182. For example, despite BHV-7000 failing to statistically differentiate from the comparator arm on the primary efficacy endpoint, the same March 3 press release reassured investors of BHV-7000's potential and stated in relevant part:

> BHV-7000 75 mg once daily, the highest dose of BHV-7000 being evaluated in Phase 2/3 trials, was safe and well-tolerated in this study. No adverse trends in vital signs, ECGs, or labs were noted. There were no treatment emergent serious adverse events. Most adverse events were mostly mild in intensity and resolved spontaneously. This offers a highly favorable and differentiated profile compared to other antiseizure medicines and is consistent with lack of GABA effects.

183. The foregoing statements were false and misleading when made because Defendants continued to reassure investors that BHV-7000 was "safe and well-tolerated[,]" "a highly favorable and differentiated profile[,]" remained a promising therapy and that the drug could still succeed in other neuropsychiatric indications, including MDD, even after Biohaven disclosed that a clinical trial evaluating BHV-7000 for the acute treatment of manic episodes associated with bipolar disorder had failed to meet its primary efficacy endpoint on the YMRS, In reality, the failure of the bipolar study materially increased the risk that BHV-7000 would also fail to demonstrate clinical efficacy in other mood-disorder indications, a risk that ultimately materialized when Biohaven later disclosed that a Phase 2 trial evaluating BHV-7000 for the treatment of MDD failed to meet its primary endpoint. Defendants portrayed preliminary biomarker findings and early clinical observations as evidence supporting the drug's efficacy and regulatory prospects for neuropsychiatric indications, including MDD, when in fact the available data did not demonstrate clinical benefit in patients or establish that BHV-7000 was likely to succeed in adequate and well-controlled trials required for regulatory approval. In particular, Defendants repeatedly emphasized EEG and other pharmacodynamic findings from early-phase studies as evidence of target engagement and as supporting the advancement of BHV-7000 into later-stage clinical trials for mood disorders, creating the misleading impression that these findings were predictive of clinical efficacy. However, such preliminary biomarker observations do not establish therapeutic benefit in patients and do not constitute reliable evidence that a drug will

demonstrate statistically significant improvement on prespecified clinical endpoints in randomized controlled trials.

184. With respect to troriluzole, the same March 3 press release continued to tout the "positive topline results in [the] pivotal study of troriluzole in SCA" and quoted Defendant Coric as stating, in relevant part:

> [W]e believe we are poised to deliver important milestones in 2025 and beyond, starting with the FDA accepting our troriluzole NDA filing resubmission and granting Priority Review ... we are making commercial plans in earnest as we await final regulatory outcomes[.]

185. Also on March 3, 2025, Biohaven filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K stated, *inter alia*:

> Collectively, data [for troriluzole] across multiple analyses demonstrate a robust and clinically meaningful slowing of disease progression in SCA patients.
>
> * * *
>
> Study BHV4157-206-RWE was designed, in discussion with the FDA, to assess the effectiveness of troriluzole in SCA after 3 years of treatment as measured by the change from baseline in the f-SARA. The study utilized Phase 3 data and an external control of matched, untreated SCA subjects from the U.S. CRC-SCA in accordance with FDA's Guidance on Real-World Evidence ("RWE") of effectiveness. All endpoints were prespecified, and both the study protocol and statistical analysis plan were submitted to, and reviewed by, FDA prior to topline data analysis
>
> * * *
>
> Based upon the topline data from Study BHV4157-206-RWE, and previous safety and efficacy data from the troriluzole development program in SCA, we submitted an NDA for the treatment of all SCA genotypes to the FDA in the fourth quarter of 2024. The troriluzole development program has generated the largest clinical trial dataset in SCA and now has follow-up in some patients treated with troriluzole for over 5 years.

186. The statements referenced in ¶¶ 184-85 were false and misleading when made because Defendants presented the results of Study 206-RWE as robust, reliable evidence of

troriluzole's clinical efficacy and regulatory viability, but failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

187. The 2024 10-K also listed Biohaven's "Risk Factors[.]" which were referenced in each quarterly filing throughout the fiscal year and include:

> The regulatory approval processes of the FDA and comparable foreign regulatory agencies are lengthy, time-consuming and unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be materially harmed ... The FDA, EMA, NMPA or any comparable foreign regulatory agency can delay, limit or deny approval of our product candidates or require us to conduct additional preclinical or clinical testing or abandon a program for many reasons, including: the FDA, EMA, NMPA or the applicable foreign regulatory agency's disagreement with the number, design, conduct or implementation of our preclinical studies and clinical trials; negative or ambiguous results from our clinical trials or results that may not meet the level of statistical significance required by the FDA, EMA, NMPA or any comparable foreign regulatory agency for approval
>
> For example, with respect to our randomized, controlled clinical trial of troriluzole for the treatment of SCA, we undertook discussions with the FDA regarding the acceptability of the primary endpoint and necessary secondary endpoints, including

> our proposal to use a modified SARA scale ... Based on feedback received from the FDA, we incorporated trial design modifications that include utilization of a modified SARA scale. However, notwithstanding the feedback that we have received from the FDA, there remains substantial risk that the FDA or any foreign regulatory agency may nevertheless conclude that results obtained using the modified SARA scale would not be an adequate basis for approval ... Post-hoc analysis of efficacy measures by genotype suggests a treatment effect in patients with the SCA Type 3 ("SCA3") genotype. There is substantial risk that the FDA, EMA, NMPA or the applicable foreign regulatory agency may disagree with the interpretation of our data, and there can be no assurance that any such regulatory agency will find the data sufficient to support approval, or that we will not be required to conduct additional testing on the safety and efficacy of troriluzole.

188. Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 113, *supra*, signed by the Individual Defendants.

189. The statements referenced in ¶¶ 187-88 were materially false and misleading when made because the FDA had already communicated to Defendants that Study 206-RWE would likely be inadequate to provide substantial evidence of efficacy particularly given Study 206's failure to meet its primary endpoint and Defendants thus knew at the time they issued the foregoing statements that the stated hypothetical risks had already hypothetical risks had already materialized or would likely materialize. Nevertheless, Defendants still presented the results of Study 206-RWE as robust, reliable evidence of troriluzole's clinical efficacy and regulatory viability, touting discussions with the FDA regarding the design, protocol and statistical analysis plan for Study 206-RWE, but failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-

history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

190. On March 4, 2025, H.C. Wainwright issued a report reiterating their "Buy" rating, but noting their surprise at the failure of the bipolar disorder trial given Defendants' stated rationale for pursuing that indication:

> The company did announce that BHV-7000 failed in a Phase 2 study in bipolar mania; BHV-7000 did not differentiate from placebo arm on the primary efficacy endpoint of improvement from baseline to Day 21 on the Young Mania Rating Scale. ***We felt the mechanistic rationale for BHV-7000 for BP mania was solid***, which perhaps raises questions around dosing—Biohaven has moved very aggressively with its potassium channel platform by moving directly into pivotal studies across a range of indications and perhaps some dose finding work in the clinic may have been a prudent step.

191. Regarding the troriluzole NDA, H.C. Wainwright reiterated Defendants' positive characterizations of the study data and indicated their expectation that an FDA approval was "highly likely":

> As a reminder, 200mg of troriluzole dosed once daily, met the study's primary endpoint on the change from baseline in the modified f-SARA at 3 years in all SCA genotypes. Notably, patients showed a 50-70% slowing of disease progression translating to a 1.5-2.2 year delay in disease progression over the 3-yr study period. Considering there are no FDA approved therapies for SCA currently, ***we believe a favorable outcome is highly likely from the upcoming FDA priority review*** and if approved, the company is prepared to commercialize troriluzole in US as early as 2025.

192. On April 25, 2025, shortly after markets opened, multiple news reports emerged that, according to the EMA, Biohaven had withdrawn its troriluzole MAA in late March 2025. For example, *Bloomberg* reported that "Biohaven shares tumble[d] as much as 26% — triggering a

volatility halt — after the drug developer withdrew its marketing application for troriluzole in the EU for the treatment of adult patients with [SCA.]" Likewise, *Seeking Alpha* reported, *inter alia*:

> The company withdrew the [troriluzole MAA] ***on Mar. 24***, citing plans to collect additional data to support a new active substance status for the drug, the EMA said. Biohaven . . . intends to submit a new marketing application after collecting necessary data, the regulator added.

193. On this news, Biohaven's stock price fell $3.56 per share, or 15.21%, to close at $19.84 per share on April 25, 2025. Despite this decline in the Company's stock price, Biohaven securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding: (i) the resubmitted troriluzole NDA, its regulatory prospects and the data submitted in support of thereof for the treatment of SCA; and (ii) the purported indications of efficacy of BHV-7000 for mood disorders, including MDD.

194. For example, on April 28, 2025, Biohaven issued a press release announcing an investment by Oberland Capital. The press release stated in relevant part:

> Biohaven Announces Investment up to $600 Million by Oberland Capital ... in exchange for capped milestone and royalty payments on future troriluzole product net sales ... $150 million available at the Company's option upon the achievement of regulatory milestones related to troriluzole ... The additional capital ... supports commercialization efforts in anticipation of a potential U.S. Food and Drug Administration (FDA) approval of troriluzole for the treatment of patients with spinocerebellar ataxia (SCA)

195. The same April 28 press release quoted Defendant Buten as stating that the "ability to secure this flexible, long-term, non-dilutive financing agreement speaks ... to the vast potential afforded by troriluzole."

196. The foregoing statements regarding troriluzole in ¶¶ 194-95 were materially false and misleading when made because Defendants touted the $600 million investment in exchange for royalty from "future troriluzole product net sales[,]" and the "achievement of regulatory

milestones related to troriluzole" and claimed the additional capital "supports commercialization efforts in anticipation of a potential U.S. Food and Drug Administration (FDA) approval of troriluzole[,]" even though Defendants were aware that the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA. Defendants failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; and (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations.

197. On May 12, 2025, Biohaven issued a press release reporting its first quarter 2025 financial results and recent business developments. The press release stated, in relevant part, that the Company had "[c]ompleted [an FDA] mid-cycle review meeting and regulatory inspections of Biohaven and key clinical research sites for [the] troriluzole [NDA] for the treatment of SCA (all genotypes);" that the "FDA ha[d] not conveyed any intention of holding an Advisory Committee Meeting;" while touting "continuity of the review process and timelines maintained throughout troriluzole's review."

198. The same May 12 press release quoted Defendant Coric as stating that the "[e]nthusiasm for [Biohaven's] rare disease and degrader programs has grown, as [Biohaven] eagerly await[s] the completion of the NDA review for troriluzole[.]"

199. Moreover, on May 12, 2025 Biohaven filed its Form 10-Q with the SEC for the quarter ended March 31, 2025.

> In September 2024, we announced positive topline results from pivotal Study BHV4157-206-RWE (NCT06529146) demonstrating the efficacy of troriluzole on the mean change from baseline in the f-SARA after 3 years of treatment. The study achieved the primary endpoint.
>
> * * *
>
> Study BHV4157-206-RWE was designed, in discussion with the FDA, to assess the effectiveness of troriluzole in SCA after 3 years of treatment as measured by the change from baseline in the f-SARA. The study utilized Phase 3 data and an external control of matched, untreated SCA subjects from the US Clinical Research Consortium for the Study of Cerebellar Ataxia ("CRC-SCA") in accordance with FDA's Guidance on Real-World Evidence ("RWE") of effectiveness. All endpoints were prespecified, and both the study protocol and statistical analysis plan were submitted to, and reviewed by, FDA prior to topline data analysis.
>
> * * *
>
> Based upon the topline data from Study BHV4157-206-RWE, and previous safety and efficacy data from the troriluzole development program in SCA, we submitted an NDA for the treatment of all SCA genotypes to the FDA in the fourth quarter of 2024. The troriluzole development program has generated the largest clinical trial dataset in SCA and now has follow-up in some patients treated with troriluzole for over 5 years. We previously received both Fast-Track and Orphan drug designation ("ODD") from the FDA, and ODD from the European Medicines Agency ("EMA"), for troriluzole in SCA. An NDA with ODD is eligible for priority FDA review.

200. Regarding BHV-7000, the Form 10-Q stated in relevant part:

> Based on the results from the EEG study and the safety profile in SAD/MAD trials, along with PK data from a new once-daily extended-release formulation, Biohaven plans on exploring three oral dose levels of once-daily BHV-7000 (25 mg, 50 mg, and 75 mg) in the Phase 2/3 clinical trials in epilepsy and mood disorders.
>
> * * *
>
> Increasing evidence from animal models and clinical trials now suggests that Kv7.2/7.3 targeting drugs offer the potential to treat a spectrum of these

> neuropsychiatric diseases including, but not limited to, mood disorders, such as major depressive disorder ("MDD"), bipolar disorder and anxiety.

201. The day following the May 12 press release, on May 13, 2025, Deutsche Bank issued an analyst report with a "Buy" rating, demonstrating that Defendants' statements gave the market reassurance that the troriluzole NDA had a likely chance of approval. Specifically, the report stated in relevant part:

> BHVN reported 1Q25 results and corporate updates. The key update was the completion of a mid-cycle review meeting with the FDA for the troriluzole NDA in SCA, with management indicating that the agency has not conveyed any intention to hold an Advisory Committee Meeting prior to decision (Priority Review; PDUFA date in 3Q25), ***which supports our view that the FDA is likely amenable (more so than its European counterpart) to granting approval for troriluzole in SCA.***
>
> ***
>
> ***[W]e maintain our 85% probability of success for troriluzole approval in the U.S.***

202. Then, on May 13, 2025, H.C. Wainwright issued a report with a "Buy" rating similarly convinced by Defendants' statements that troriluzole would "likely" obtain FDA approval:

> Troriluzole is currently in Phase 3 development for OCD, and the NDA mid-cycle review meeting with the FDA for the treatment of spinocerebellar ataxia (SCA) has been completed. Regulatory inspections of Biohaven and key clinical research sites have also been completed. The FDA has not communicated any intention of holding an ADCOM meeting. We note that the company was previously granted priority review with a PDUFA action date expected in 3Q25. As a reminder, 200mg of troriluzole dosed once daily, met the study's primary endpoint on the change from baseline in the modified f-SARA at 3 years in all SCA genotypes. Patients achieved 50-70% slowing of disease progression, translating to a 1.5-2.2-year delay in disease progression over the 3-yr study period. There are currently no FDA-approved therapies for SCA, so ***we think approval is likely***

203. The statements regarding troriluzole set forth in ¶¶ 197-99 were materially false and misleading because when made because Defendants failed to disclose that the FDA had repeatedly informed Defendants during the development and regulatory review of troriluzole that the Company's reliance on Study 206-RWE, an externally controlled comparison of Study 206

participants to natural history cohorts, was unlikely to provide the "substantial evidence of effectiveness" required for approval under 21 C.F.R. §314.126. In particular, the FDA had warned Biohaven that Study 206-RWE would likely be inadequate as a primary evidentiary basis for approval because the randomized, double-blind Study 206 had failed to achieve statistical significance on its prespecified primary endpoint. The FDA further advised Biohaven that the proposed external control analyses were susceptible to significant bias and confounding, including baseline differences between trial participants and natural history controls, lack of blinding, lack of true prespecification of the statistical analysis plan, and other methodological limitations that would undermine the reliability and interpretability of the results. Despite these warnings, Defendants issued statements designed to assure investors regarding the strength of the troriluzole NDA including that Study 206-RWE had been designed with FDA input, that the protocol and statistical analysis plan were "prespecified" and reviewed by the FDA, and that the resulting data constituted "robust," "compelling," and "clinically meaningful" evidence sufficient to support regulatory approval and near-term commercialization of troriluzole. In reality, as the FDA ultimately confirmed in its November 5, 2025 Complete Response Letter, Study 206-RWE suffered from bias and fundamental methodological flaws that rendered the study incapable of serving as an adequate and well-controlled investigation and therefore insufficient to establish substantial evidence of effectiveness for troriluzole.

204. The statements regarding BHV-7000 set forth in ¶¶ 200 were materially false and misleading because when made because Defendants portrayed preliminary biomarker findings and early clinical observations as evidence supporting the drug's efficacy and regulatory prospects for neuropsychiatric indications, including bipolar disorder and MDD, when in fact the available data did not demonstrate clinical benefit in patients or establish that BHV-7000 was likely to succeed

in adequate and well-controlled trials required for regulatory approval. In particular, Defendants repeatedly emphasized EEG and other pharmacodynamic findings from early-phase studies as evidence of target engagement and as supporting the advancement of BHV-7000 into later-stage clinical trials for mood disorders, creating the misleading impression that these findings were predictive of clinical efficacy. However, such preliminary biomarker observations do not establish therapeutic benefit in patients and do not constitute reliable evidence that a drug will demonstrate statistically significant improvement on prespecified clinical endpoints in randomized controlled trials. Moreover, even after Biohaven disclosed on March 3, 2025 that a clinical trial evaluating BHV-7000 for the acute treatment of manic episodes associated with bipolar disorder had failed to meet its primary efficacy endpoint on the YMRS, Defendants continued to reassure investors that BHV-7000 remained a promising therapy and that the drug could still succeed in other neuropsychiatric indications, including MDD. In reality, the failure of the bipolar study materially increased the risk that BHV-7000 would also fail to demonstrate clinical efficacy in other mood-disorder indications, a risk that ultimately materialized when Biohaven later disclosed that a Phase 2 trial evaluating BHV-7000 for the treatment of MDD failed to meet its primary endpoint.

**<u>The Truth Continues to Emerge</u>**

205. On May 14, 2025, during after-market hours, a mere two days after Biohaven stated that "the FDA ha[d] not conveyed any intention of holding an Advisory Committee Meeting," Biohaven issued a press release announcing that the FDA had extended the PDUFA date for the troriluzole NDA following the Company's responses to information requests from the FDA and the FDA planned to hold an advisory committee meeting. The press release stated, in relevant part:

> [T]he Division of Neurology 1 within FDA's Office of Neuroscience informed the Company that they are extending the PDUFA date for the troriluzole [NDA] for the treatment of [SCA] by three months to provide time for a full review of Biohaven's recent submissions related to information requests from the FDA. The Division also

> informed Biohaven that it is currently planning to hold an advisory committee meeting to discuss the application, but no date has been scheduled … The FDA's decision regarding the NDA is now expected in 4Q 2025.

206. On this news, Biohaven's stock price fell $3.84 per share, or 19.53%, to close at $15.82 per share on May 15, 2025 on unusually heavy trading volume. Despite this decline in the Company's stock price, Biohaven securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding: (i) the resubmitted troriluzole NDA, its regulatory prospects and the data submitted in support of thereof for the treatment of SCA; and (ii) the purported indications of efficacy of BHV-7000 for mood disorders, including MDD.

207. For example, despite the FDA's decision to extend the PDUFA date for the troriluzole NDA, the May 14, 2025 press release assured investors that "[t]he FDA did not raise any new concerns in the letter." The same press release reiterated the favorable data and stated in relevant part:

> The clinical data presented in the NDA show a highly favorable benefit-risk profile with troriluzole, a once-daily oral pill, slowing disease progression by 50-70%, as measured by the f-SARA scale, and reducing the risk of falls. We look forward to a meeting with the advisory committee to discuss troriluzole's potential to improve the lives of individuals with SCA ... The Company recently announced it has completed the FDA mid-cycle review meeting and regulatory inspections of Biohaven and key clinical research sites for troriluzole in the treatment of SCA. The mid cycle review concluded that there were no previously unidentified major safety concerns, and it does not appear a Risk Evaluation and Mitigation Strategy (REMS) is needed.

208. On May 28, 2025, Biohaven presented at its R&D Day. Biohaven once again reassured investors of the regulatory prospects of its resubmitted troriluzole NDA and the submitted data. The presentation slides stated, *inter alia*:

> Efficacy and Safety Demonstrated Over 8 Years
> • Study 206-RWE met prespecified primary endpoint (f-SARA at Year 3) in all SCA genotypes

• Additional confirmatory evidence from Study 206-RWE, Study 206 and Study 201
Biohaven Will Be Ready to Serve Patients Upon Anticipated Approval ...
• Preparing for US commercial launch in 2H 2025 in event of approval

* * *

Strong Mechanistic Rationale[:] Preclinical and clinical evidence for role of glutamate in SCA
Clinically Meaningful Effect on f-SARA [:] Clear evidence for troriluzole benefit in SCA
Impact on Disease Progression[:] Observed across the 8- year SCA development program
Reduction in Falls[:] Falling is cardinal feature of SCAs leading to injury and reduced QoL

209. The foregoing statements regarding troriluzole in ¶¶ 207-08 were materially false and misleading when made because Defendants presented the results of Study 206-RWE as robust, reliable evidence of troriluzole's clinical efficacy and regulatory viability, but failed to disclose that: (i) even if the FDA "did not raise any ***new*** concerns" in the letter extending the PDUFA date," the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven previously that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

210. With respect to BHV-7000, the same May 28 presentation stated, *inter alia*, that "Increasing Clinical Evidence Supports Potential of Kv7 Activation in MDD."

211. The foregoing statements were false and misleading when made because Defendants portrayed preliminary biomarker findings and early clinical observations as evidence supporting the drug's efficacy and regulatory prospects for neuropsychiatric indications, including MDD, when in fact the available data did not demonstrate clinical benefit in patients or establish that BHV-7000 was likely to succeed in adequate and well-controlled trials required for regulatory approval. In particular, Defendants repeatedly emphasized EEG and other pharmacodynamic findings from early-phase studies as evidence of target engagement and as supporting the advancement of BHV-7000 into later-stage clinical trials for mood disorders, creating the misleading impression that these findings were predictive of clinical efficacy. However, such preliminary biomarker observations do not establish therapeutic benefit in patients and do not constitute reliable evidence that a drug will demonstrate statistically significant improvement on prespecified clinical endpoints in randomized controlled trials. Moreover, even after Biohaven disclosed on March 3, 2025 that a clinical trial evaluating BHV-7000 for the acute treatment of manic episodes associated with bipolar disorder had failed to meet its primary efficacy endpoint on the YMRS, Defendants continued to reassure investors that BHV-7000 remained a promising therapy and that the drug could still succeed in other neuropsychiatric indications, including MDD. In reality, the failure of the bipolar study materially increased the risk that BHV-7000 would also fail to demonstrate clinical efficacy in other mood-disorder indications, a risk that ultimately materialized when Biohaven later disclosed that a Phase 2 trial evaluating BHV-7000 for the treatment of MDD failed to meet its primary endpoint.

212. On August 11, 2025, Biohaven issued a press release reporting its Q2 2025 financial results and recent business developments. The press release quoted Defendant Coric as stating, in relevant part:

> As we eagerly await a regulatory decision on the VYGLXIA® (troriluzole) NDA for spinocerebellar ataxia … We are excited about the prospects of launching the first treatment for SCA if VYGLXIA is approved by the FDA and our commercial team is taking the appropriate steps to ensure an efficient launch ... We believe the SCA data supports approval

213. With respect to BHV-7000, the same August 11 press release also quoted Defendant Coric as stating, in relevant part:

> We also continue to take bold steps in other therapeutic areas to address important unmet medical needs for patients including in our Ion Channel … Our Kv7 platform continues to advance clinical programs toward completion in epilepsy and depression.

214. Also on August 11, 2025, Biohaven filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2FY25 10-Q"). The Q2FY25 10-Q stated, *inter alia*:

> In May 2025, the Division of Neurology 1 within the FDA's Office of Neuroscience informed us that they were extending the Prescription Drug User Free Act ("PDUFA") date for the troriluzole NDA by three months to provide time for a full review of Biohaven's recent submissions related to information requests from the FDA. The Division also informed us that it is currently planning to hold an advisory committee meeting to discuss the application, but no date has been scheduled. The FDA did not raise any new concerns in the letter. The FDA's decision regarding the NDA is now expected during the fourth quarter of 2025. Based on FDA priority review timelines, if troriluzole is ultimately approved by the FDA, we expect to begin commercial activities for troriluzole for SCA in the U.S. in 2025

215. Regarding BHV-7000, the August 11 Form 10-Q stated in relevant part:

> Increasing evidence from animal models and clinical trials now suggests that Kv7.2/7.3 targeting drugs offer the potential to treat a spectrum of these neuropsychiatric diseases including, but not limited to, mood disorders, such as major depressive disorder ("MDD"), bipolar disorder and anxiety.

* * *

> Based on the results from the EEG study and the safety profile in SAD/MAD trials, along with PK data from a new once-daily extended-release formulation, Biohaven plans on exploring three oral dose levels of once-daily BHV-7000 (25 mg, 50 mg, and 75 mg) in the Phase 2/3 clinical trials in epilepsy and mood disorders.

216. The foregoing statements regarding troriluzole in ¶¶ 212, 214 were materially false and misleading because when made because Defendants continued to discuss the potential of "commercial activities" and the possibility of approval, but failed to disclose that: (i) the FDA had previously informed Biohaven that Study 206-RWE—an externally controlled comparison of Study 206 participants to natural history cohorts—would likely be inadequate to provide substantial evidence of effectiveness under 21 C.F.R. §314.126, particularly given that the randomized, placebo-controlled Study 206 failed to meet its primary endpoint; (ii) the FDA had further warned Biohaven that the proposed external control data sources were not "fit-for-purpose" and that the analyses would likely be difficult to interpret and susceptible to bias due to baseline differences between trial subjects and natural-history controls; (iii) the FDA continued to express concerns during subsequent regulatory interactions that the proposed analyses were not blinded, were not truly prespecified, and would be vulnerable to residual confounding and other methodological limitations; and (iv) as a result of these issues, the data generated from Study 206-RWE was unlikely to satisfy the FDA's requirement for substantial evidence of effectiveness and therefore was unlikely to support approval of the troriluzole NDA.

217. The foregoing statements regarding BHV-7000 in ¶¶ 213, 215 were false and misleading when made because Defendants continued to tout Biohaven's "bold steps" and advancement in "Kv7 ... clinical programs toward completion ... in depression[,]" even after Biohaven disclosed on March 3, 2025 that a clinical trial evaluating BHV-7000 for the acute treatment of manic episodes associated with bipolar disorder had failed to meet its primary efficacy endpoint on the YMRS. Defendants continued to reassure investors that BHV-7000 remained a

promising therapy and that—based on available data—the drug could still succeed in other neuropsychiatric indications, including MDD. In reality, the failure of the bipolar study materially increased the risk that BHV-7000 would also fail to demonstrate clinical efficacy in other mood-disorder indications, a risk that ultimately materialized when Biohaven later disclosed that a Phase 2 trial evaluating BHV-7000 for the treatment of MDD failed to meet its primary endpoint.

218. On November 5, 2025, Biohaven announced that the FDA had issued a CRL for the troriluzole NDA. The FDA concluded that Biohaven had failed to establish substantial evidence of effectiveness because Study 206-RWE was not an adequate and well-controlled investigation and was subject to numerous methodological flaws, including residual confounding, substantial missing data, timing bias, measurement differences, and lack of prespecified analyses. The FDA further rejected Biohaven's reliance on post hoc subgroup analyses and fall-risk analyses from Study 206.

219. Specifically, the CRL explained that Biohaven's externally controlled Study 206-RWE could not constitute an "adequate and well-controlled investigation" capable of supporting approval because the study suffered from multiple fundamental methodological flaws. *First*, the FDA determined that the natural-history datasets used as external controls were not sufficiently comparable to the trial population and were susceptible to unmeasured confounding and bias, particularly given differences in baseline characteristics and the overlap of study sites between the clinical trial and natural-history cohorts. *Second*, the FDA found that the study missed substantial data, i.e., the Year 3 outcome data for more than half of treated subjects and nearly four-fifths of control subjects, which undermined the reliability of the reported treatment effect. *Third*, the FDA identified critical methodological inconsistencies between the datasets being compared, including differences in the timing of clinical assessments and the conversion of SARA scores from the

natural-history datasets into f-SARA scores used in the trial. *Fourth*, the FDA determined that the study's protocol and statistical analysis plan were not truly prespecified because they were developed with knowledge of prior analyses comparing Study 206 participants with external cohorts. According to the FDA, these methodological limitations introduced biases that could not be reliably quantified or corrected and rendered Study 206-RWE incapable of providing substantial evidence of effectiveness. Additionally, the FDA made clear that the treatment difference of -0.79 on f-SARA was "of uncertain clinical meaningfulness," i.e., "[t]he treatment effect is not sufficiently large or robust to overcome the concerns with the multiple methodological limitations identified above" and "is unable to serve as an adequate and well-controlled study."

220. These findings directly contradicted Defendants' repeated representations to investors that Study 206-RWE provided "robust[,]" "statistically significant[,]" and "clinically meaningful" evidence demonstrating that troriluzole slowed disease progression in SCA patients.

221. Moreover, the CRL made clear that the FDA had repeatedly communicated these grave deficiencies and the substantial likelihood that Study 206-RWE would not suffice to constitute substantial evidence of efficacy to Defendants, *even before the resubmission.*

222. Following this shocking revelation, Biohaven's stock price fell $5.61 per share, or 40.22%, to close at $8.34 per share on November 5, 2025 on unusually heavy trading volume. Despite this decline in the Company's stock price, Biohaven securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the purported indications of efficacy of BHV-7000 for mood disorders, including MDD.

223. Then on December 24, 2025, after the market closed early for Christmas Eve, Biohaven issued a press release announcing results from a Phase 2 proof-of-concept clinical study

evaluating BHV-7000 for the treatment of MDD. The Company disclosed that the study "did not meet its primary endpoint," which was a reduction in depressive symptoms measured by change in the MADRS over six weeks compared with placebo. Although Biohaven highlighted certain subgroup "[t]rends[,]" the Company acknowledged that "the results of this study do not support the efficacy of BHV-7000 in a broad population of depressed patients" and stated that it would abandon additional psychiatric clinical trials for the drug. This disclosure revealed further material weaknesses in the clinical prospects of BHV-7000 that Defendants had previously characterized as having "potent efficacy[,]" "strong support" for pivotal development, and "blockbuster potential."

224. In response to this news in after-hours trading, Biohaven stock fell 17% from its close of $10.81 to $9.08. Following the Christmas and New Years holidays, Fierce Biotech ran coverage of the December 24, 2025 disclosure on Friday, January 2, 2026. The Fierce Biotech article, titled *Biohaven Flunks Phase 2 Depression Trial, Adding to Concerns for Pivotal Epilepsy Readout*, stated in relevant part:

> As the biopharma wound down for the holidays, the company reported the failure of a midphase study of BHV-7000 for the treatment of major depressive disorder (MDD).
>
> The study, which aimed to enroll 300 patients, compared the selective activator of Kv7.2/7.3 potassium channels to placebo. After six weeks of daily treatment, the drug candidate was no better at alleviating depressive symptoms, as measured on the Montgomery-Åsberg Depression Rating Scale.

The article confirmed that "analysts were [] disappointed by the Biohaven[,]" noted that "the company has opted against running additional psychiatric clinical trials[,]" and that analysts therefore "removed BHV-7000 in MDD from their Biohaven model…" The article also noted that the failure followed Biohaven's earlier disclosure that BHV-7000 had failed to demonstrate

efficacy in a clinical trial for acute manic episodes associated with bipolar disorder, highlighting mounting concerns regarding the drug's clinical viability across neuropsychiatric indications.

225. As the market absorbed the strategically released pre-holiday news that Biohaven could not continue to pursue *any* psychiatric indication for BHV-7000, and the resulting implications, Biohaven stock continued to plummet, dropping 3.99% from its previous close of $11.29 to $10.84 on January 2, 2026 and an additional 8.39% the following trading day on January 5, 2026 when it closed at $9.93.

***

226. The disclosures described above gradually revealed to the market the risks that Defendants had concealed or materially misrepresented during the Class Period. Beginning on July 27, 2023, when the FDA refused to file Biohaven's initial NDA for troriluzole after the pivotal Phase 3 study failed to meet its primary endpoint, investors learned that the regulatory prospects of the drug faced greater risk than Defendants had represented. Subsequently, in the wake of Defendants' repeated assurances that their resubmission based on RWE evidence had the FDA's imprimatur, further disclosures including the withdrawal of Biohaven's European marketing application for troriluzole in March 2025, the FDA's extension of the PDUFA review date in May 2025, and ultimately the FDA's issuance of the CRL on November 5, 2025 concluding that Biohaven had failed to establish substantial evidence of effectiveness (and that the FDA had repeatedly communicated this likelihood to Biohaven even before the resubmission), further revealed the fundamental weaknesses in the Company's regulatory strategy and supporting clinical evidence.

227. Moreover, investors gradually learned through the disclosures on March 3, 2025 and December 24, 2025 that Biohaven's Kv7 ion channel activator BHV-7000 had failed to

demonstrate efficacy in controlled clinical trials for neuropsychiatric indications, including bipolar disorder and MDD, contradicting Defendants' earlier representations that the drug had strong clinical prospects. As these previously concealed risks and deficiencies became known, the price of Biohaven securities declined substantially, causing significant losses and damages to Plaintiff and other members of the Class.

**Regulation S-K Item 303**

228. Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Biohaven to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants failed to disclose, *inter alia*, troriluzole's true regulatory prospects as a treatment for SCA, and/or the insufficiency of the data that Biohaven submitted in support of troriluzole's regulatory approval for this indication. Defendants also failed to disclose BHV-7000's actual efficacy and clinical prospects as a treatment for bipolar disorder. Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**SCIENTER ALLEGATIONS**

229. During the Class Period, Defendants had both the motive and opportunity to commit fraud and acted with conscious misbehavior or recklessness in making the materially false and misleading statements and omissions alleged herein. As senior executives responsible for Biohaven's clinical development programs and regulatory strategy, Defendants were directly involved in overseeing the development and regulatory submissions for the Company's most important pipeline assets, including troriluzole and BHV-7000. Defendants had access to internal

clinical data, regulatory communications, and other non-public information concerning the efficacy and regulatory viability of these programs. Despite this knowledge, Defendants repeatedly issued statements that materially misrepresented the strength of the underlying clinical evidence and the likelihood that these drug candidates would obtain regulatory approval.

230. The clinical development and regulatory status of Biohaven's lead drug candidates constituted core operations of the Company during the Class Period. As described above, Biohaven had no approved products and its business prospects depended entirely on the successful development and regulatory approval of a limited number of investigational drug candidates, including troriluzole and BHV-7000. Biohaven's own public filings emphasized that its business "depends entirely on the success of a limited number of product candidates, which are in clinical development." Given the central importance of these programs to Biohaven's business, it is implausible that senior management—including Defendant Coric, the Company's CEO and Defendant Buten the Company's CFO—was unaware of the study results, regulatory feedback, and methodological limitations affecting the development of these key pipeline assets.

231. As a result, Defendants knew or recklessly disregarded that the statements they made regarding the efficacy and regulatory prospects of these programs were materially misleading.

232. In particular, Defendants were aware of the significant regulatory risks associated with Biohaven's reliance on Study 206-RWE, an externally controlled comparison of participants in Study 206 to natural history cohorts. They also knew or should have known that the FDA has never approved an NDA for a drug product based ***solely*** on RWE evidence. Moreover, as alleged herein and as described in the CRL, the FDA repeatedly informed Biohaven during the development and regulatory review of troriluzole that such externally controlled analyses were

unlikely to provide the "substantial evidence of effectiveness" required for approval under 21 C.F.R. §314.126, particularly given that the randomized Phase 3 Study 206 had failed to achieve statistical significance on its prespecified primary endpoint. The FDA had further advised Defendants that natural history datasets used as external controls might not be "fit-for-purpose" and that comparisons between trial participants and external cohorts could be difficult to interpret and subject to bias due to baseline differences and unmeasured confounding factors. Defendant Coric was very involved in the resubmission process for the troriluzole NDA and participated in the communications with the FDA. Defendants nevertheless continued to represent to investors that the Study 206-RWE analyses had been designed with FDA input, were prespecified and methodologically sound, and provided robust evidence supporting regulatory approval.

233. Similarly, Defendants knew or recklessly disregarded that the preliminary biomarker and pharmacodynamic observations they cited in support of BHV-7000's neuropsychiatric development program did not demonstrate clinical efficacy. They further knew or should have known that no data existed supporting the efficacy of potassium channel activators to treat any type of mania. Defendants nevertheless portrayed early EEG and other pharmacodynamic findings as evidence supporting the drug's potential as a treatment for bipolar disorder and MDD. Even after Biohaven disclosed in March 2025 that a clinical trial evaluating BHV-7000 for the acute treatment of bipolar mania had failed to meet its primary efficacy endpoint, Defendants continued to reassure investors that the drug remained a promising therapy for other psychiatric indications such as MDD.

234. Defendants' repeated assurances regarding the strength of the clinical data and regulatory prospects for these programs, despite their knowledge of the significant scientific and

regulatory deficiencies described above, give rise to a strong inference that Defendants acted with at least deliberate recklessness in making the statements alleged herein.

235. In addition, Defendants had motive and opportunity to misrepresent the efficacy and regulatory prospects of Biohaven's lead pipeline assets to preserve investor confidence, and support Biohaven's ability to raise capital and fund its clinical development programs. Specifically, Defendants' representations regarding the strength of Biohaven's pipeline, including troriluzole and BHV-7000, coincided with and helped facilitate the Company's ability to raise substantial capital through multiple transactions, including its April 2024 and October 2024 public offerings and its April 2025 structured financing, the latter of which was expressly linked to the anticipated approval and commercialization of troriluzole.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

236. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

237. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Biohaven securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Biohaven or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

238. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

239. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

240. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Biohaven;
- whether the Individual Defendants caused Biohaven to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Biohaven securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

241. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

242. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Biohaven securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Biohaven securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

243. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

244. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

245. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Biohaven securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Biohaven securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

248. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Biohaven securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Biohaven's finances and business prospects.

249. By virtue of their positions at Biohaven, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

250. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Biohaven, the Individual Defendants had knowledge of the details of Biohaven's internal affairs.

251. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Biohaven. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Biohaven's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Biohaven securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Biohaven's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Biohaven securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

252. During the Class Period, Biohaven securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Biohaven securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Biohaven securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Biohaven securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

253. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

254. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

255. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

256. During the Class Period, the Individual Defendants participated in the operation and management of Biohaven, and conducted and participated, directly and indirectly, in the conduct of Biohaven's business affairs. Because of their senior positions, they knew the adverse non-public information about Biohaven's misstatement of income and expenses and false financial statements.

257. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Biohaven's financial condition and results of operations, and to correct promptly any public statements issued by Biohaven which had become materially false or misleading.

258. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Biohaven disseminated in the marketplace during the Class Period concerning Biohaven's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Biohaven to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Biohaven within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Biohaven securities.

259. Each of the Individual Defendants, therefore, acted as a controlling person of Biohaven. By reason of their senior management positions and/or being directors of Biohaven, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Biohaven to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Biohaven and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

260. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Biohaven.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 17, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman

(*pro hac vice* application forthcoming)
Tamar A. Weinrib
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
taweinrib@pomlaw.com

*Lead Counsel for Plaintiff*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Plaintiff John C. Sasse*