UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KAYLA TAYLOR, Individually and on Behalf of All Others Similarly Situated, *Plaintiff*,<br><br>v.<br><br>BIOHAVEN LTD. ET AL., *Defendants*. | No. 3:25-cv-01120 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Lead Plaintiff John C. Sasse, individually and on behalf of others similarly situated, has sued Biohaven Ltd., Vlad Coric, and Matthew Buten (collectively, the "Defendants") for allegedly violating federal securities laws during the period from March 24, 2023, through January 5, 2026 ("Class Period"). Specifically, Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. §78j(b), and 17 C.F.R. §240.10b-5 ("Rule 10b-5"). Against Mr. Coric and Mr. Buten, Plaintiff alleges violations of Section 20(a) of the Exchange Act. Plaintiff seeks damages from Defendants to cover the alleged harm sustained by Plaintiff and the putative class on account of the alleged acts and transactions, pre and postjudgment interest, expert fees, attorneys' fees, and costs.

Defendants have moved to dismiss the Amended Complaint. Def. Mot. to Dismiss Am. Compl., ECF No. 45.

For the following reasons, the motion to dismiss is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Biohaven Ltd. ("Biohaven") is a biopharmaceutical company "organized under the laws of the British Virgin Islands, with principal executive offices located" in New Haven, Connecticut.

Am. Compl. ¶ 37, ECF No. 41 (Mar. 17, 2026). Biohaven, which began publicly trading shares on October 4, 2022, "discovers, develops, and seeks to commercialize therapies for immunology, neuroscience, and oncology." *Id.* ¶ 45. Vlad Coric and Matthew Buten work for Biohaven as Chief Executive Officer and Chief Financial Officer respectively. *Id.* ¶¶ 39–40.

Incorporated in May 2022, Biohaven later "spun off" from its parent company when the parent was acquired by Pfizer Inc. *Id.* ¶ 45. As a "clinical stage" company, Biohaven spends much of its resources investigating and developing drugs before seeking regulatory approval to bring drugs to the market. *Id.* ¶ 46. Since its "inception," Biohaven "has incurred significant operation losses" reporting net losses of $570.3 million in 2022, $408.2 million in 2023, $846.4 million in 2024, and an "accumulated deficit of approximately $1.35 billion" at the end of 2024. *Id.* ¶ 47. Biohaven's success depended significantly "on the success of its clinical stage pipeline." *Id.* ¶ 2. That is, whether Biohaven became profitable relied in large part on the success of their clinical trials, their ability to discover or develop profitable uses for drugs, and their ability to secure regulatory approval to manufacture and sell these drugs. *Id.* ¶¶ 48–49. The "investor valuation" of the company depended significantly on the "perceived regulatory prospects of its lead drug candidates. *Id.* ¶ 2.

Plaintiff alleges that Biohaven's actions, statements, and omissions regarding their research and regulatory applications for two drugs, troriluzole and BHV-7000, were false and/or misleading. *Id.* ¶ 17. Specifically, Plaintiff alleges that Biohaven "misrepresented the strength of the clinical evidence" and "concealed significant scientific and regulatory risks that materially undermined the likelihood that these drugs would demonstrate efficacy or obtain regulatory approval." *Id.* ¶ 3. Biohaven's misleading communication allegedly caused a "precipitous decline

in the market value of Biohaven's securities" which, in turn, caused Plaintiff to suffer "significant losses and damages." *Id.* ¶¶ 30–31.

**1. Troriluzole**

In the human body, troriluzole converts to riluzole, which "modulates glutamergic signaling in the brain." *Id.* ¶ 75. Modulation of "glutamergic signaling" can help manage "excessive glutamate activity" in the central nervous system. *Id.* Excessive glutamate activity "damage[s] neurons" and is linked to "several neurodegenerative disorders, including amyotrophic lateral sclerosis ('ALS')." *Id.* Spinocerebellar ataxia ("SCA") refers to a group of "genetically distinct neurodegenerative disorders caused by mutations in different genes." *Id.* ¶ 52. The varying gene mutations are "referred to as separate genotypes" and are differentiated by different labels for each genotype: SCA1, SCA2, SCA3, and so forth. *Id.* Each SCA genotype can manifest "varying disease progression, clinical manifestations, and responses to potential therapies." *Id.* Two patients with distinct genotypes may have SCA that presents differently and reacts to potential treatment differently as well. *Id.*

**i. Study 206 and the First New Drug Application**

Biohaven developed troriluzole based on its belief that the drug could "affect disease progression in disorders such as SCA." *Id.* ¶ 75. Their goal was to determine whether the drug could "slow disease progression in patients with SCA." *Id.* ¶ 78. Biohaven's Study[1] BHC4157-206 ("Study 206") was a "randomized, double-blind, placebo-controlled clinical trial" assessing the "efficacy" of troriluzole as a treatment for SCA. *Id.* Over a 48-week period, Biohaven assessed whether troriluzole "improved or slowed worsening of disease symptoms." *Id.* Study 206 "enrolled

[1] Study 206 was a Phase 3 study. The purpose of studies in this phase is to "gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 12 C.F.R. § 312.21(c).

patients with multiple SCA genotypes including SCA1, SCA3, and others. *Id.* ¶ 52. In May 2022, Study 206 "failed to meet its primary endpoint" signaling a less than statistically significant change[2] in disease progression throughout the course of the study. *Id.* ¶¶ 50–53. Biohaven claims that the failure to reach the primary endpoint was due to "less than expected disease progression over the course of the study." *Id.* ¶¶ 4, 53.

Following Study 206's completion, Biohaven allegedly focused on "post-hoc subgroup analyses" which suggested a "potential benefit" for patients with the most common form of SCA, SCA3. *Id.* Plaintiff alleges that these subgroup findings were "exploratory," and departed from the "prespecified basis for demonstrating efficacy." *Id.* ¶ 53. Still, Biohaven allegedly represented that "post-hoc subgroup analyses and related exploratory findings demonstrated clinically meaningful treatment benefits and supported the drug's regulatory prospects." *Id.* ¶ 4. Specifically, Biohaven allegedly represented that the post-hoc analysis focused on SCA3 patients suggested "statistically significant improvements" among certain patients. *Id.* ¶ 80.

Relying on these post-hoc analyses of Study 206 and "exploratory findings," Biohaven announced its submission of a New Drug Application to the U.S. Food and Drug Administration ("FDA") in May 2023. *Id.* ¶ 6. In a May 31, 2023 press release, Biohaven and Mr. Coric discussed the New Drug Application and the clinical process that preceded it, noting "consistent treatment benefits in patients with genotype SCA3." *Id.* ¶¶ 115–116. Mr. Coric noted that the New Drug Application was the culmination of a seven-year "effort by the Biohaven team to bring forward a potentially new treatment for this ultra-rare disease," and expressed Biohaven's intention to work with regulators "across the globe" throughout the application process. *Id.* ¶ 116. Plaintiff alleges

[2] Plaintiff alleges that Study 206 "produced a mean change difference on the [functional Scale for the Assessment and Rating of Ataxia] ("f-SARA") of -0.55" when compared to the placebo in week 48 of the trial. This result, indicated a nominal p-value of 0.053, and represented failure to meet "statistical significance in the overall study population." *See* Am. Compl. ¶¶ 50, 79.

that Biohaven maintained "that the drug produced clinically meaningful efficacy despite [Study 206's] failure to achieve statistical significance in the overall study population." *Id.*

On July 27, 2023, Biohaven publicly disclosed that the FDA "refus[ed] to even review the application because Study 206 had failed to meet its primary endpoint" and had issued a "refusal to file letter." *Id.* ¶¶ 6, 79. Biohaven's stock price dropped by "$5.38 per share, or 22.61%" closing at "$18.42 per share on July 27, 2023." *Id.* ¶ 7. At this point, Plaintiff alleges Biohaven continued to represent that the "clinical data demonstrated meaningful treatment benefits" and that "a viable pathway to regulatory approval" remained. *Id.* ¶ 9.

**ii. Study 206-RWE and the Resubmitted New Drug Application**

Following the FDA's refusal to file letter, Biohaven had a "Type A meeting" with the FDA. *Id.* ¶ 81. The typical goal of these meetings, according to Plaintiff, is to "address stalled development programs and disputes regarding development or approval." *Id.* ¶ 71. Biohaven then allegedly turned to "an alternative evidentiary approach" that differed from Study 206. *Id.* ¶ 81. The new approach relied on "real-world evidence derived from patients who had continued receiving troriluzole in the open-label extension of Study 206." *Id.*

Biohaven compared results in patients "treated with troriluzole" for many years with SCA patients who had received no treatment. *Id.* The untreated patient data was sourced from "independent observational studies" and were external to Biohaven's own data collection. *Id.* Biohaven employed "statistical matching techniques" to appropriately compare the external patient data to data from patients in Study 206. *Id.* Biohaven's goal was to determine whether patients on troriluzole experienced slower disease progression when compared to untreated patients. *Id.* This real-world study is referred to by Plaintiff as BHV4157-206-RWE ("Study 206-RWE"). On December 16, 2024, Biohaven announced that it had resubmitted the New Drug

Application to the FDA after a "pre-NDA meeting" (pre–New Drug Application meeting) with the FDA in late 2024. *Id.* ¶ 12.

Plaintiff alleges that, at some point beginning in 2023, the FDA began warning Biohaven that its methodology in Study 206-RWE "would likely be insufficient to establish the substantial evidence of effectiveness required for approval," in part, because the initial study, Study 206, "had failed to meet its primary endpoint." *Id.* ¶ 14. These warnings continued through 2024. *Id.* A confidential witness who worked as a regulatory associate and prepared reports for the New Drug Application reports that the FDA communicated multiple times with Biohaven and on several occasions advised that "the study data would not suffice to demonstrate troriluzole's efficacy in treating SCA." *Id.* ¶¶ 43, 86.

"[A]bsent an unusually large treatment effect" the FDA allegedly warned Biohaven that the "significant bias" in "externally controlled comparisons" would make showing "substantial evidence of effectiveness" unlikely. *Id.* ¶¶ 14, 84. As the FDA communicated its concerns regarding the limitations of Study 206-RWE, Mr. Coric allegedly was one of the Biohaven representatives "receiving and responding to feedback from the FDA" regarding the resubmission of the New Drug Application. *Id.* ¶¶ 85–86. Despite these warnings, Plaintiff alleges that Biohaven and Mr. Coric continued telling investors that the data was clinically meaningful, robust, and that regulatory approval was still possible. *Id.* ¶ 15.

On May 14, 2025, Biohaven announced that the FDA had extended its review of Biohaven's resubmission by three months and that the FDA intended to host an "advisory committee meeting to discuss the application." *Id.* ¶ 24. Biohaven's "stock price fell by $3.84 per share, or 19.53%" closing at $15.82 per share on May 15, 2025.

On November 5, 2025, Biohaven shared that the FDA had issued a "Complete Response Letter" rejecting the resubmitted New Drug Application. *Id.* ¶ 27. Plaintiff alleges that the FDA determined that Biohaven had not established "substantial evidence of effectiveness," "that the controlled analyses [Biohaven] relied [on] were methodologically flawed," and could not support approval, and that the FDA had warned Biohaven on numerous occasions before this letter, that a "study based on real world evidence would likely be inadequate to provide the substantial evidence of efficacy" required for a successful application. *Id.* The FDA cited several methodological issues that could not be overcome because the "magnitude of the observed treatment effect" was not great enough. *Id.* ¶ 94. This letter delivered another shock to Biohaven's stock price; it fell 40.22%, about $5.61 per share, and closed at $8.34 per share on November 5, 2025. *Id.* ¶ 28.

Plaintiff alleges that "the regulatory and clinical prospects of … troriluzole were widely viewed by investors and industry analysts as key drivers of Biohaven's business prospects and valuation." *Id.* ¶ 48. Plaintiff further alleges that various statements made by Biohaven and the individual Defendants in press releases and SEC filings were misleading because they continued to present information which suggested that the "NDA submission had a meaningful likelihood of approval," when it did not. *Id.* ¶ 117.

**iii. The European Application**

In its 2022 Form 10-K, filed on March 23, 2023, Biohaven expressed an intent to "interact" with the European Medicines Agency ("EMA") in the first half of 2023 given their findings regarding troriluzole's benefits. *Id.* ¶ 112. Biohaven later specified its intent, sharing its plan to submit a Marketing Authorization Application ("MAA") to the EMA in the latter half of 2023. *Id.* ¶ 128. Biohaven submitted the MAA and by November 14, 2023, Biohaven reported that their MAA had been "validated" and was under review by the EMA. *Id.* ¶ 130. On November 12, 2024,

Biohaven issued a press release explaining that Biohaven had attended a meeting with EMA representatives, that application documents would be updated to include new data from Study 206-RWE for all SCA genotypes, and the MAA was still under review. *Id.* ¶ 162.

By April 25, 2025, media outlets began reporting that Biohaven had withdrawn its MAA in March 2025. *Id.* ¶ 21. The stock price allegedly dropped by 15%, about $3.56 a share. *Id.* ¶ 22. The stock closed at $19.84 per share on April 25, 2025.

**2. BHV-7000**

BHV-7000 is part of a "platform referred to as 'Kv7.2/7.3 targeting drugs.'" Def. Mem. in Supp. of Mot. to Dismiss Am. Compl., ECF No. 45-1 (May 18, 2026) ("Mem. in Supp. of Mot. to Dismiss"). This class of drug, known as a "kv7 potassium channel activator," has historically been used to treat epilepsy. Am. Compl. ¶ 16.

Biohaven "pursued development of BHV-7000" to treat "acute manic episodes associated with bipolar disorder." *Id.* In 2022, Biohaven conducted Phase 1[3] studies to "assess the drug's safety profile." Mem. in Supp. of Mot. to Dismiss at 12. In 2023, Biohaven ran another Phase 1 trial to "assess 'rhythmic activity'" in the brains of healthy individuals to gauge BHV-7000's effect on "[electroencephalogram] spectral power." *Id.* at 13. By 2024, Biohaven had begun trials to study BHV-7000 for the treatment of bipolar disorder and major depressive disorder. *Id.*

These trials were focused on the efficacy of the drug. *Id.* Before Biohaven's pursuit, this class of drugs had never "demonstrated clinical efficacy" for treating bipolar disorder. Am. Compl. ¶ 16. A confidential witness, who "worked at Biohaven as a senior clinical development employee"

[3] A Phase 1 study "includes the initial introduction of an investigational new drug into humans" and are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." "Phase 1 studies also include studies of drug metabolism, structure-activity relationships, and mechanism of action in humans, as well as studies in which investigational drugs are used as research tools to explore biological phenomena or disease processes." 12 C.F.R. § 312.21(a).

and oversaw the "development program" for BHV-7000, allegedly described Biohaven's BHV-7000 venture as "very high risk" because no activator of its kind had been "clinically tested for the treatment of bipolar mania and no data existed suggesting efficacy for that indication." *Id.* ¶¶ 43, 99.

On March 3, 2025, Biohaven shared publicly that "recent data from a late-stage study of BHV-7000 in bipolar mania failed to demonstrate efficacy." *Id.* ¶ 18. The failure stemmed from the fact that BHV-7000 "did not statistically separate from the comparator" on the relevant rating scale. *Id.* This failure, Plaintiff alleges, caused a negative effect on Biohaven's stock price which dropped by 13.77% percent or $5.12, closing at $32.06 per share on the same day. *Id.* ¶ 19. Plaintiff alleges that despite the failing results of the study, Biohaven continued to "portray BHV-7000 as a promising therapy," leading investors to believe that the "bipolar study failure did not undermine the broader clinical prospects of the Kv7 platform for mood disorder indications." *Id.* ¶ 20. Biohaven "failed to disclose" that this failure increased the likelihood that "similar clinical trial designs" testing BHV-7000's efficacy for treating other mood disorders would also fail. *Id.* ¶ 106.

Months later on December 24, 2025, Biohaven reported that its "Phase 2[4]" clinical trial evaluating BHV-7000 for the treatment of major depressive disorder had failed to meet its primary endpoint." *Id.* ¶ 29. Biohaven further disclosed that it would "discontinue further psychiatric development of the drug." *Id.* ¶ 30. The market responded. On January 2, 2026, Biohaven's stock price fell nearly 4% and three days later dropped an additional 8.39%, closing at $9.93 per share on January 5, 2026.

[4] At Phase 2, an investigation or study "evaluate[s] the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and . . . determine[s] the common short-term side effects and risks associated with the drug." 12 C.F.R. § 312.21(b).

Plaintiff alleges that, throughout the relevant period,[5] Biohaven claimed that "biomarker and target engagement signals in early-phase trials" suggested "efficacy" and "blockbuster potential" for BHV-7000's ability to treat "neuropsychiatric mood disorders." *Id.* ¶ 103. But this was not the case, Plaintiff asserts. *Id.* ¶ 104. Nevertheless, Biohaven and its representatives, including Mr. Coric, allegedly misled investors with their statements.

**B. Procedural History**

On July 14, 2025, Plaintiff filed a Complaint against Biohaven, Vlad Coric, and Matthew Buten. Compl., ECF No. 1.

On September 12, 2025, Sebastian Barthelmess, Howard Necomb, and John C. Sasse each filed a motion to appoint counsel and to appoint lead plaintiff. Barthelmess Mot. to Appoint Counsel and Lead Plaintiff, ECF No. 13; Newcomb Mot. to Appoint Counsel and Lead Plaintiff, ECF No. 14; Sasse Mot. to Appoint Counsel and Lead Plaintiff, ECF No. 15.

On January 16, 2026, the Court entered and Order granting Mr. Sasse's motion to be appointed lead plaintiff and his motion to appoint counsel and denying the motions made by Mr. Newcom and Mr. Barthelmess. Order Appointing Lead Counsel and Lead Pl, ECF No. 34.

On March 17, 2026, Plaintiff filed an Amended Complaint. Am. Compl., ECF No. 41.

On May 18, 2026, Defendants filed a motion to dismiss the Amended Complaint and a memorandum in support of the motion. Def. Mot. to Dismiss Am. Compl., ECF No. 45; Def. Mem. in Supp. of Mot. to Dismiss Am. Compl., ECF No. 45-1.

On July 17, 2026, Plaintiff filed a memorandum in opposition to Defendants' motion to dismiss. Pl. Mem. in Opp'n to Mot. to Dismiss, ECF No. 48.

---

[5] The relevant period here, as defined by Plaintiff, is the "Class Period" which spans from March 24, 2023, through January 5, 2026. *See* Am. Compl. ¶ 1.

On August 31, 2026, Defendants filed a reply in response to Plaintiff's memorandum in opposition to Defendants' motion to dismiss. Def. Reply to Pl. Resp. to Mot. to Dismiss, ECF No. 58.

On September 15, 2026, the Court scheduled a hearing on the motion to dismiss for November 2, 2026. Order for Hr'g, ECF No. 59.

On October 26, 2026, Defendants submitted a notice of supplemental authority to the Court. Def. Suppl. Authority Notice, ECF No. 63.

On October 28, 2026, the Plaintiff responded to the notice of supplemental authority. Pl. Resp. to Suppl. Authority Notice, ECF No. 64.

On November 2, 2026, the Court held a hearing on the motion to dismiss.

## II. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the

complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

In addition to the pleading standards discussed above, actions brought under the federal securities laws are subject to a heightened pleading standard. "Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b),] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Ivanhoe Inv. Partners, L.P. v. Windsor Sec., LLC*, No. 21-506-

cv, 2025 WL 573497 at *1 (2d Cir. Feb. 21, 2025) (summary order) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

## III. DISCUSSION

### A. The Exchange Act and Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful for any person to

> "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. §78j(b). Rule 10-b5 makes it unlawful for any person:

> "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 C.F.R. §240.10b-5.

In general, "[a] complaint alleging securities fraud [must] satisfy the heightened pleading standard of the Private Litigation Securities Reform Act . . . and Federal Rule of Civil Procedure

9(b) . . .” *One Commc’ns Corp. v. JP Morgan SBIC LLC*, 381 F. App’x 75, 78 (2d Cir. 2010) (summary order) (citing *ATSI Commc’ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007)). Plaintiffs stating a claim under Section 10(b) of the Exchange Act and Rule 10b-5 “must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.” *Ivanhoe*, 2025 WL 573497 at *1 (internal quotation marks omitted) (quoting *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021)); *see also ATSI*, 493 F.3d at 105 (“[A] plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.”).

“A securities fraud complaint based on [material] misstatements [or omissions] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.” *One Commc’ns Corp.*, 381 F. App’x at 78 (internal quotation marks omitted) (quoting *ATSI*, 493 F.3d at 99); *see also City of Hialeah Emps.’ Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025) (citation modified) (“Under this heightened pleading standard plaintiffs must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so”).

“[F]or an alleged statement to be material under Section 10(b) . . . it must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome.” *Hialeah*, 153 F.4th at 295 (citation modified). Conclusory allegations untethered from factual assertions do not suffice. *One Commc’ns Corp.*, 381 F. App’x at 78 (quoting *ATSI*,

493 F.3d at 99). Notably, an alleged violation of Rule 10b-5(b) based on a material omission must allege that the defendants told a half-truth rather than purely failing to state information. *See Macquarie Infrastructure Corp v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) ("Rule 10b–5(b) does not proscribe pure omissions. The Rule prohibits omitting material facts necessary to make the statements made ... not misleading. Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . This Rule therefore covers half-truths, not pure omissions. Logically and by its plain text, the Rule requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements "not misleading.") (citation modified). While plaintiffs in securities litigation matters shoulder a heightened pleading standard under Rule 9(b), courts "must be careful not to mistake heightened pleading standards for impossible ones." *Police and Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings. Ltd.*, No. 22-cv-8971 (LAK), 2024 WL 5089970, at *3 (S.D.N.Y. Dec. 12, 2024) (quoting *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021)) (internal quotation marks omitted).

In private securities actions, plaintiffs must plead scienter or "proof of a particular state of mind" to satisfy "PSLRA's pleading requirements or [they] face dismissal." *ATSI*, 493 F.3d at 99. The complaint must

> "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind . . . and plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."

*Id.* (quoting 15 U.S.C. §78u-4(b)(2)) (citing *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168–169 (2d Cir. 2000)) (internal quotation marks omitted). For claims brought under Section 10(b) and Rule 10b-5; plaintiffs must allege that defendants acted with a mental state marked by intent "to deceive, manipulate, or defraud." *Saraf v. Ebix, Inc.*, No. 23-1182-cv, 2024 WL 1298246, at *4 (2d Cir. Mar. 27, 2024) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319 (2007). These factual allegations must be pled with particularity. *Tellabs*, 551 U.S. at 313. As courts determine whether the facts, as pleaded, "give rise to a strong inference of scienter" they must consider "plausible opposing inferences." *ATSI,* 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 323). An inference of scienter is only strong if a reasonable person would find it "cogent and at least as compelling as an opposing inference one could draw" from plaintiff's factual allegations. *Id.* (quoting *Tellabs*, 551 U.S. at 324).

Defendants move to dismiss the Exchange Act and Rule 10b-5(b) claims on several grounds.

First, Defendants argue that Plaintiff's Amended Complaint does not satisfy the heightened pleading standard under the Private Litigation Securities Reform Act ("PLSRA"). Additionally, Defendants assert that Plaintiff fails to allege any actionable misstatement or omission, fails to "establish a cogent and compelling inference of fraud," fails to "plead a viable claim against each defendant," and fails to adequately plead loss causation.

The Court will first address the sufficiency of the Amended Complaint under the applicable pleading standard, and then to the extent necessary, the other grounds for dismissal.

**1. Rule 9(b)'s Particularity Requirements**

Plaintiff identifies several statements made by Biohaven, Mr. Coric, and one statement by Mr. Buten that are allegedly false or otherwise misleading to investors. Am. Compl. ¶¶ 110–223.[6]

Regarding trorulizole, Plaintiff alleges that through press releases, Form 10-Ks, Form 10-Qs, presentations and calls Defendants misled investors about the efficacy of the drug, overstated the clinical success of the trials, and misrepresented the likelihood of regulatory approval. *Id.* ¶¶ 110–112, 114–117, 120, 122–123, 127–129, 130–131, 137–140, 150–158, 161–164, 167–168, 173–174, 176, 179, 184–189, 194–199, 203, 205, 207–209, 212, 214, 216, 220. For Biohaven's handling of BHV-7000 development, Plaintiff alleges that Biohaven misrepresented the "significance of the data," misled investors by suggesting that trials would yield clinical benefits, and overstated the clinical prospects of BHV-7000. *Id.* ¶¶ 118, 119, 124, 125, 132–136, 141–143, 145–149, 171–172, 180, 182–183, 200, 204, 210, 211, 213, 215, 217, 223.

Defendants argue that Plaintiff fails to "challenge a targeted set of statements" and instead includes more than fifty statements while failing to "demonstrate how and why each statement is materially false or misleading." Mem. in Supp. of Mot. to Dismiss at 16. Defendants argue that the Amended Complaint is akin to a puzzle with no clear indication of which statements are allegedly false.

The Court disagrees.

While securities litigation alleging fraud sometimes includes voluminous statements allegedly made by defendants, volume alone is not a basis for dismissal. *See In re Actinium Pharm.*

[6] Some of the paragraphs included in this range include news reports by third parties. The Court includes those paragraphs in this range but does not attribute the statements of third parties to Defendants nor does it use those statements to assess the sufficiency of the allegations against Defendants. The exact paragraphs including statements by Defendants and allegations of misrepresentation by Plaintiff are detailed in this paragraph. The Court does not include all of these statements in their entirety, given their length and number.

*Inc., Sec. Litig.*, No. 25-CV-2553 (JPO), 2026 WL 2621057, at *4 (S.D.N.Y. Sep. 4. 2026) (noting that the plaintiff listed a "litany of purportedly misleading statements and omissions across Actinium's public filings, press releases, and investor calls" totaling more than thirty statements but continuing the analysis to determine whether the allegations were actionable.). Defendants cite the Second Circuit's decision to affirm the dismissal of a complaint that included large blocks of quoted text and thin explanations of why the statements were fraudulent. *See Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); Mem. in Supp. of Mot. to Dismiss at 16–17.

But, unlike the complaint in *Bahash*, which forced the court to parse the factual details of the complaint and create its own basis for the allegations of fraud, Plaintiff provides for each allegedly false or misleading statement: the exact statement, the speaker to whom the statement is attributed, the place where the statement was made, the time the statement was made, and Plaintiff's assertion as to why this statement in particular was false or misleading which satisfies the basic pleading requirement outlined in *ATSI*. *See ATSI*, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."). Plaintiff has successfully identified a targeted set of statements, even if that targeted set of statements includes more than fifty statements in total.

Accordingly, this is not a basis for dismissing the Amended Complaint.

**2. The Allegedly Materially False and/or Misleading Statements**

"The test for whether a statement is materially misleading . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Smith v. Gap, Inc.*, 177 F.4th 405, 409 (2d Cir. 2026) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.2

(2d Cir. 2004)) (internal quotation marks omitted). Half-truths or "[o]missions are material when 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)). "[R]easonable investor[s] 'read[] each statement . . . whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)). The veracity of a statement is not assessed in a vacuum based on "literal truth but by context and manner of representation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation modified).

Corporations and their representatives make many statements, but not all their statements are actionable under the securities laws. Under Rule 10b-5(b) a "material statement of fact [is only] actionable if [it] is untrue. *In Re Shanda Games Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025). Also, a statement expressing an opinion, as opposed to a fact, is actionable only if "(1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *Id.* (citation modified); *see also In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (quoting *Omnicare*, 575 U.S. at 186) ("[W]here a statement expresses an 'inherently subjective . . . assessment,' that is *also* sufficient to render it one 'of pure opinion.'") (emphasis in original).

And statements amounting to "puffery" are inactionable. *See Gluck v. Hecla Mining Co.*, No. 24-2947-cv, 2025 WL 1983204, at *2 (2d Cir. July 17, 2025) (summary order) ("A speaker engages in puffery when he claims to be 'pretty confident' and 'pretty positive' about the future

or makes vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices. Such statements are too general to cause a reasonable investor to rely upon them.") (citation modified); *Singh*, 918 F.3d at 63 ("General statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them") (citation modified).

Finally, if a "forward-looking statement is . . . (i)identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," the PSLRA provides a safe harbor which renders those statements inactionable. *See* 15 U.S.C. § 78u-5(c)(1). The safe harbor provision also applies to forward-looking statements if "the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading." *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004).

**i. Statements by Biohaven**

**a. Study 206 and the First New Drug Application**

Plaintiff alleges that numerous statements made by Biohaven during the Class Period in press releases, Forms 10-K, and Forms 10-Q misled investors regarding the efficacy of troriluzole and its prospects for regulatory approval. *See, eg.*, Am. Compl. ¶¶ 110–112, 115, 117.

First, Plaintiff suggests that the efficacy of troriluzole was overstated. The alleged statements include, but are not limited to, a March 2023 press release in which Biohaven stated that although Study 206 failed to meet its primary endpoint, "post hoc analysis of efficacy measures by genotype suggested a treatment effect in patients with the SCA Type 3." *Id.* ¶ 110. Plaintiff similarly uses a statement made in the 2022 10-K in which Biohaven states that the post hoc analysis "suggests a treatment effect in patients" and that these findings and the "debilitating

nature of SCA" encouraged Biohaven to "interact" with regulatory agencies in early 2023. *Id.* ¶ 112. According to Plaintiff, these statements were "false and misleading because," Biohaven described the "post-hoc subgroup analyses" and "exploratory fall-risk observations" as indicators that "troriluzole produced a 'clinically meaningful improvement'" that could potentially support a regulatory submission. *Id.* ¶ 114. In Plaintiff's view, the exploratory findings "did not constitute reliable evidence of clinical efficacy" and fell short of the "effectiveness required for approval under FDA standards".

The Court disagrees.

First, Biohaven's "statements as to their own interpretations of the results" of the study "are not actionable." *Sporn v. BrainStorm Cell Therapuetics, Inc.*, No. 23 Civ. 9630, 2025 WL 2643983, at *6 (S.D.N.Y. Sep. 15, 2025). "Publicly stated interpretations of the results of various clinical studies . . . are non-actionable opinions because reasonable persons may disagree over how to analyze data and interpret results." *Id.* (quoting *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18 Civ. 8049, 2021 WL 4135059, at *9 (S.D.N.Y. Sep. 10, 2021)).

Plaintiff takes issue with the first New Drug Application relying primarily on "post-hoc subgroup analyses and exploratory comparisons to external or natural-history data," but fails to sufficiently allege how any of Biohaven's statements related to the efficacy of troriluzole or the evidence used to support the first New Drug Application are false or misleading. Am. Compl. ¶ 117. Biohaven was forthcoming, as early as May 2022, that Study 206 failed to meet its primary endpoint. *Id.* ¶¶ 50, 110 ("[I]n May 2022, Biohaven had announced top-line results from Study-206 . . . which had failed to meet its primary endpoint . . ."). Biohaven was also clear that post hoc analyses of Study 206 and comparisons to an external control group were the basis of their belief that a troriluzole had a treatment effect. *Id.* ¶¶ 112, 115 ("Post hoc analysis of efficacy measures

by genotype suggests a treatment effect in patients with the [SCA3] genotype . . . The risk reduction of falls in the troriluzole group combined with the progression of f-SARA scores in the untreated SCA3 group compared to SCA3 patients on troriluzole demonstrates that SCA3 patients experienced a clinically meaningful improvement in ataxia symptoms on troriluzole treatment.") ("NDA further supported by a composite scale development (SCACOMS) and analysis of Study BHV4157-206, and confirmatory evidence of efficacy provided by data from the 3-year, long-term open-label (OLE) extension phase of two studies (BHV4157-206 and BHV4157-201) using a Matching Adjusted Indirect Comparison (MAIC) to an external control group.")

To the extent investors were led to believe that the "clinical data demonstrated that troriluzole was efficacious for SCA," generally[7] *id.* ¶ 123, that belief cannot rationally be based on Biohaven's comments regarding Study 206's clinical results because Biohaven was clear about the study's failure. Biohaven's statements about what the exploratory analyses and post-hoc analysis demonstrate are inactionable opinions. Taken together, all the statements made about Study 206 show an initial failure, an attempt to recover from that failure by focusing on a subset of the study's results, and a reliance on results from external control groups to show efficacy. A reasonable investor would understand that a strong showing of efficacy, one that might be demonstrated by a study meeting its primary endpoint, did not exist based on the totality of Biohaven's statements.

Biohaven's alleged statements ahead of the application submission were conditional statements and/or forward-looking statements protected by the PSLRA's safe harbor provision.

---

[7] Biohaven's study failed to reach the primary endpoint but the company did report that a treatment benefit was observed for the SCA3 genotype during Study 206. *See* Am. Compl. ¶ 115 "NDA supported by consistent treatment benefits observed in patients with genotype SCA3 in Study BHV4157-206 across multiple outcome measures including the change from baseline f-SARA at Week 48, CGI-I total score at Week 48, and a robust reduction in fall risk over the study period."

Biohaven stated in their 2022 10-K filed in March 2023 that they intended to "interact" with regulatory agencies in 2023 and would submit a New Drug Application "if we believe that is warranted from the results of our ongoing post-hoc analyses." *Id.* ¶ 112. Plaintiff alleges that Biohaven "portray[ed] these exploratory findings as demonstrating meaningful clinical benefit and suggest[ed] that the data could support a regulatory submission . . . creat[ing] the misleading impression that the Study 206 results meaningfully established the efficacy of troriluzole for SCA3 and provided a viable pathway to regulatory approval." *Id.* ¶ 114. But the distance between what Biohaven said and Plaintiff's alleged interpretation of it is significant.

Biohaven expressed that its post hoc analysis suggested a treatment effect and that these findings might lead to regulatory interaction, with the possibility of a New Drug Application submission. *Id.* ¶ 112. They did not claim that Study 206 results established efficacy nor did they make claims about the chances of regulatory approval. The statements are hypothetical and conditional, "we could choose to submit an NDA *if* we believe that is warranted." *Id.* ¶ 112. Even if an investor read this as suggesting that a "viable pathway" to regulatory approval was possible, the safe harbor provision of the PSLRA makes the statements inactionable because Biohaven includes "cautionary statements identifying important factors" that might affect their decision to apply at all, most notably the results of their "ongoing post-hoc analyses." 15 U.S.C. § 78u-5(c)(1); *id.* ¶ 112.

Indeed, the page immediately following the challenged statement in the 2022 Form 10-K includes the following disclosure by Biohaven,

> Biotechnology product development is a highly speculative undertaking and involves a substantial degree of risk. We do not have any products that have received regulatory approval, and

> therefore we have never generated any revenue from product sales, and we may never be able to develop product candidates that receive regulatory approval or are successfully commercialized after regulatory approval is received.

Ex. 2 to Mot. to Dismiss at 42, ECF No. 45-5 (May 18, 2026) ("2022 Form 10-K"). Biohaven continues,

> We cannot be certain that we will be able to submit a new drug application ("NDA"), biologics license application ("BLA") or comparable applications in other jurisdictions for any of our product candidates within the timeframes we expect, or that any NDA, BLA or similar application we submit will be accepted by the FDA or comparable foreign regulators for filing in a timely manner or at all.

*Id.* The text surrounding the allegedly misleading statement includes enough information for a reasonable investor to conclude that regulatory approval was not a guarantee. *Cf. Singh*, 918 F.3d at 64 ("Because the challenged statements are tentative and generic, and because they emphasize the complex, evolving regulatory environment that Cigna faced, we conclude that Plaintiffs have failed to plausibly allege that a reasonable investor would view these statements as having significantly altered the total mix of information made available. These statements are not, therefore, materially misleading.") (internal quotation marks omitted).

Plaintiff alleges that Biohaven also misled investors as it relates to the application submitted to the EMA. In a November 2023 press release, Biohaven stated that the EMA had informed them that its application "for troriluzole . . . in the treatment of [SCA] has been validated and is now under review by EMA's Committee for Medicinal Products for Human Use." Am.

Compl. ¶ 130. Plaintiff claims that this statement was "materially false and misleading when made" because the use of the word 'validated' "created the misleading impression that the troriluzole application had a meaningful likelihood of approval" even though "validation is a largely administrative step that does not reflect any determination by regulators regarding the sufficiency of the clinical evidence supporting the application." *Id.* ¶ 131. For many reasons, this argument fails.

Even if validation is a "largely administrative step" as Plaintiff describes, it is not materially false for Biohaven to use the word commonly used to describe a standard step in the application. If validation is how applicants and the EMA itself refer to this stage of the process, it is difficult to understand how using this standard language would mislead the reasonable investor.[8] *Cf. In Re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 538–540 (S.D.N.Y. 2015) (explaining that investors had "reason to know" information because it had been publicly disclosed on the website of a federal agency.). Assuming, for purposes of this analysis, that 'validating' is an uncommon word to describe this stage of the process, it is still dubious that reasonable investors would read 'validation' as the EMA positively commenting on or assessing "the clinical evidence supporting the application." By November 2023, Biohaven had publicly disclosed that Study 206 had failed and that the FDA declined to even review the first New Drug Application due to its clinical evidence deficiencies. Additional context from Biohaven, noting that validation is an administrative step, would not "have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives,* 563 U.S. at

[8] The EMA itself notes that following submission of the application, "validation of the application" is the next step. "EMA performs a technical validation of the applications it receives. The objective is to make sure all essential regulatory elements required for scientific assessment are included in the application prior to the start of the procedure." Eur. Med. Agency, *Obtaining an EU marketing authorization, step-by-step*, https://www.ema.europa.eu/en/human-regulatory-overview/marketing-authorisation/obtaining-eu-marketing-authorisation-step-step (last visited Nov. 11, 2026).

38. By November 2023 the reasonable investor had access to information which made the "significant limitations of the underlying clinical data and the resulting regulatory risk" related to troriluzole quite clear. Am. Compl. ¶ 131.

The remaining statements related to Study 206, the post-hoc analyses, and the first New Drug Application suffer from the same deficiencies identified above. In many instances, Plaintiff interprets what Biohaven has not actually said and makes assumptions unsupported by Biohaven's actual words. In other instances, puffery, corporate optimism, opinions, or statements with qualifiers serve as the basis for Plaintiff's claim. *See Singh*, 918 F.3d at 63 (recognizing that "general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them") (citation modified).

**b. Study 206 RWE and the Second New Drug Application**

Plaintiff alleges that Biohaven made materially false and misleading statements related to Study 206-RWE and the regulatory risk associated with the second New Drug Application in its 2023 Form 10-K and in a press release issued in early 2024. In the press release issued on February 29, 2024, Biohaven expressed that, after the FDA declined to review the First New Drug Application, they had engaged in "constructive dialogue with the FDA regarding [their] SCA development program and potential future data analyses to address regulatory concerns" which led to the FDA's decision in the first application. *Id.* ¶ 137.

The Form 10-K statement is similar. *Id.* ¶ 138. Biohaven also made numerous statements representing that: (1) they were incorporating the FDA's feedback while designing Study 206-RWE, (2) they were following FDA guidance, (3) the results from Study 206-RWE were positive, and (4) they planned to submit a renewed application based on the results of Study 206-RWE and

"previous safety and efficacy data from the troriluzole development program." *Id.* ¶¶ 150, 152–154.

Plaintiff alleges that these statements were false and misleading when made because Defendants had been told by the FDA that Study 206-RWE "would likely be inadequate to provide substantial evidence of effectiveness" and was unlikely to support approval. *Id.* ¶ 140, 158. According to Plaintiff, Biohaven "presented the results of Study 206-RWE as robust, reliable evidence of troriluzole's clinical efficacy and regulatory viability" but in truth Biohaven knew the data was insufficient and the application was "likely" bound to fail because the FDA had told them as much. *Id.* ¶ 158.

The Court disagrees.

These statements are inactionable.

First, Biohaven did engage in constructive conversations with the FDA. Plaintiff does not contest that these conversations happened, but instead alleges that the feedback given was mostly negative. But Biohaven did not ever represent, explicitly or implicitly, that they were receiving glowing feedback. And they were under no obligation to share the FDA's feedback. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 584–585 (S.D.N.Y. 2016) ("It is well established that there is no affirmative duty to disclose the substance of interim feedback received from the FDA during the pendency of a drug application. Rather, such feedback must be disclosed only where its omission would render another statement materially misleading."); *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) ("Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process . . . sophisticated investors . . . would fully expect that Defendants and the FDA were engaged in a dialogue, as they were here, about the sufficiency of various aspects of the clinical trials and that inherent in the nature of a dialogue are

differing views.") (citation modified); *Id.* at 212 ("Defendants need not have disclosed the FDA feedback merely because it tended to cut against their projections . . .").

Next, Biohaven stated that they were following FDA Guidance. This is a classic example of puffery. *See In Re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) (explaining that a statement declaring a chief executive officer "law-abiding" is puffery because it is a general statement and "[c]orporate officers are presumed to be law-abiding; it would be an unusual company that was unwilling to say that about its officers generally."); *In Re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020) (finding a company's statements that it was "conduct[ing] rigorous scientific assessment[s] . . . following a rigorous scientific assessment program . . . and conducting research [that] meets rigorous standards" to be "mere puffery.") (internal quotation marks omitted).

Biohaven also stated that the results of Study 206-RWE were positive and they intended to submit a renewed New Drug Application. Plaintiff does not allege that Biohaven did not believe the results of Study 206-RWE were positive. Biohaven's continued monetary and time investment in trorulizole, continued pursuit of regulatory approval, and its public statements suggest that it believed Study 206-RWE showed real benefits that could support regulatory approval. *Cf. In Re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 531 (noting that the fact that the defendant corporation spent billions of dollars and conducted clinical trials for a decade cut against the allegation that they "secretly believe[d]" FDA approval was unlikely or impossible).

The FDA's communication of its doubts and deficiencies in the data provided by Biohaven does not render Biohaven's statements false or misleading. *See Tongue*, 816 F.3d at 214 ("Defendants' statements about the effectiveness of [the drug] cannot be misleading merely because the FDA disagreed with the conclusion—so long as Defendants conducted a 'meaningful'

inquiry and in fact held that view, the statements did not mislead in a manner that is actionable.”). Biohaven’s statements regarding their hopes and plans for commercialization of troriluzole, *see* Am. Compl. ¶¶ 156, 184, 208, 212, 214, are also “nonactionable corporate optimism.” *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) (finding a corporation’s statement that a drug would be ready to go to market “hopefully” in a year nonactionable).

Finally, Plaintiff alleges that Biohaven knew the data from Study 206-RWE was not sufficient for regulatory approval. But the FDA minutes and letter referenced by Plaintiff as support for this allegation do not foreclose approval in a manner that would alert Biohaven that regulatory approval was out of the picture. The FDA meeting minutes allegedly stated that “a large and robust treatment effect would be needed to overcome the biases of an externally controlled trial, in order for it to be used as the primary basis for substantial evidence for effectiveness.” Am. Compl. ¶ 84. That a large and robust treatment effect would need to be found is not a total rebuke of the methods Biohaven was using nor is it a denial by the FDA. It is a warning that because Biohaven was taking a less preferred route, they would need a more robust showing of efficacy.

Plaintiff alleges that following this meeting, in continued conversation with Biohaven, the FDA expressed concerns that put Biohaven on notice that Study 206-RWE’s data would not be sufficient to show effectiveness or support approval of the New Drug Application. Am. Compl. ¶ 140. But Plaintiff identifies no statement by the FDA, before the denial of the New Drug Application in November 2025, where the FDA says unequivocally that the New Drug Application was sure to fail.

As discussed above, Biohaven disclosed the risk inherent in submitting applications to the FDA. *See, e.g.*, Ex. 11 to Mot. to Dismiss at 49, ECF No. 45-14 (May 18, 2026) (“2023 Form 10-

K") ("We have not yet demonstrated an ability to obtain marketing approvals for any product candidates, manufacture products on a commercial scale, or arrange for a third party to do so on our behalf, or conduct sales and marketing activities necessary for successful commercialization. Consequently, predictions about our future success or viability may not be as accurate as they could be if we had a longer operating history or a history of successfully developing and commercializing products."). Biohaven had no obligation to share negative feedback with investors other than to clear up another misleading statement, which does not exist here, and its continued belief that the data might be strong enough for approval is an inactionable opinion. *See Tongue*, 816 F.3d at 212 ("[F]atal to Plaintiffs' case is the absence of any serious conflict between the FDA's interim, albeit repeated, concerns about methodology and Defendants' optimism about FDA approval."); *id.* at 213 ("Sophisticated investors, aware of the FDA's strong preference for double-blind trials, cannot claim surprise when it is revealed that the FDA meant what it said. Especially where a complex financial instrument whose value is tied to FDA approval is involved, investors may be expected to keep themselves apprised of the FDA's public positions on testing methodology."); *cf. In re Bristol-Meyers Squibb Securities Litigation*, 312 F. Supp. 2d at 558 ("Taken in context, Lane's statement regarding FDA approval cannot be considered a guarantee of FDA approval or otherwise false or misleading . . . . Any reasonable investor reading these statements, or any of the other statements . . . complained of by Plaintiffs, would recognize that Defendants could not and did not guarantee [approval] by the FDA, either in the near term or at all. Statements such as these are plainly opinions, not guarantees, and are not actionable.") (citation modified).

**c. BHV-7000**

Plaintiff alleges that throughout the Class Period, Biohaven made false and misleading statements regarding its study of BHV-7000. Plaintiff's identified statements include statements

by Biohaven stating their opinions of the data. *See* Am. Compl. ¶¶ 118, 124, 132, 133, 134, 141, 145, 147, 148, 168,171, 182, 200, 210, 215. For example, Biohaven reported "positive, interim data from an [EEG] biomarker study," "burgeoning evidence for therapeutic benefits," and that BHV-7000 had "blockbuster potential." Id. ¶¶ 124, 118, 134. All of these statements are inactionable opinions about the results of clinical studies. *See Sporn*, 2025 WL 2643983, at *6 ("[T]o the extent that Plaintiffs . . . challenge Defendants' statements as to their own interpretations of the results of the clinicial trial . . . such statements are not actionable.").

Biohaven's other allegedly false and misleading statements regarding BHV-7000 pertain to its plans to conduct Phase 2 and Phase 3 trials. Am. Compl. ¶ 200. This statement, indicating future plans, is not actionable because it is a forward-looking statement and Plaintiff has not sufficiently alleged that the statement was made with actual knowledge of falsity. *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d at 35 ("Forward looking statements include financial projections, descriptions of future plans or objectives of management, and discussions of future economic performance.").

**ii. Statements by Vlad Coric**

Plaintiff alleges that Mr. Coric, Biohaven's Chief Executive Officer, made several statements in press releases and on calls regarding both troriluzole and BHV-7000 that misled investors as to the strength of clinical results and the potential for regulatory approval. Mr. Coric's statements include commentary about the company's clinical trials for troriluzole, statements about the company's intention to interact with regulatory agencies, opinions about the strength of the application to the FDA, results from the phased studies of BHV-7000, comments about BHV-7000's potential, and the company's commercial preparation. *See* Am. Compl. ¶¶ 116, 122, 127, 132, 135, 156, 157, 161, 198, 212, 213, 217. For reasons explained in detail above, Mr. Coric's

alleged statements are inactionable opinions, puffery, or forward-looking statements. *See In Re Philip Morris*, 89 F.4th at 420–421 (explaining that a defendant's interpretation of data is not misleading solely because others disagree and noting that as long as the defendant conducted a "meaningful inquiry" and actually held the belief the statements are not actionable); *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 423–424 (S.D.N.Y. 2023) (explaining that statements concerning FDA approval of a drug are "protected" forward-looking statements and because the speaker made clear that FDA approval was not "assured" the statements are not actionable); *cf. In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 354 (W.D.N.Y. 2008) (holding that statements referencing "expectations, goals, outlook, guidance, targets, and projections in relation to future earnings are not actionable under the Securities law.").

**iii. Statements by Matthew Buten**

Plaintiff identifies one allegedly false and/or misleading statement made by Mr. Buten in an April 2025 press release. *Id.* ¶ 195. Following a six-hundred-million-dollar investment, Mr. Buten noted that Biohaven's ability to secure such an investment "speaks . . . to the vast potential afforded by troriluzole." *Id.* For reasons explained above, this statement is inactionable because it is puffery and it expresses Mr. Buten's opinion. *Cf. Gross v. AT&T Inc.*, No. 19-CV-2892, 2021 WL 9803956, at *4 (S.D.N.Y. Sep. 27, 2021) (noting that "statements expressing corporate optimism about the future strength of a company's product are not actionable as false statements of fact" but instead are inactionable puffery and opinion statements.).

Accordingly, for all of the reasons stated above, Plaintiff has failed to allege the false and misleading statements necessary to sustain their Exchange Act and Rule 10b-5 claims, and their Amended Complaint must be dismissed on those grounds.

### 3. Scienter

Even if Plaintiff's Exchange Act and Rule 10b-5 claims had plead the requisite false and misleading statements necessary to sustain them, pleading scienter is necessary to survive a motion to dismiss. *See ATSI Commc'ns, Inc.*, 493 F.3d at 99 ("In pleading scienter in an action for money damages requiring proof of a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.") (citation modified). Plaintiff may plead scienter in two distinct ways.

#### i. Motive and Opportunity to Defraud

Plaintiffs seeking to establish a "strong inference of scienter through motive and opportunity to defraud . . . must allege that the defendant corporation or its officers benefitted in some concrete and personal way from the purported fraud." *Saraf*, 2024 WL 1298246, at *5 (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)) (citation modified).

Motives shared by most corporate insiders, including appearing profitable or showing a strong corporate performance, are insufficient to plead scienter under the motive and opportunity theory. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("We have stated that motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not entail concrete benefits.") (citation modified); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation" . . . "[W]e

[have] rejected as insufficient plaintiffs' allegations that the defendants concealed and misrepresented the corporation's financial condition to inflate the price of the common stock and to maintain artificially high prices in order to protect their executive positions and compensation. Such motive allegations, we observed, were common to all corporate executives and, thus, too generalized to demonstrate scienter.") (citation modified); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*, Inc., 75 F.3d 801, 814 (2d Cir. 1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because 'if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'") (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (citation modified).

Defendants argue that the Plaintiff's "complaint is bereft of any plausible allegations of motive." Mem. in Supp. of Mot. to Dismiss at 31. They do not dispute that they had opportunity to defraud. But, Plaintiff has failed, according to Defendants to allege that Defendants have benefited concretely and personally from the alleged fraud. *Id.*

Plaintiff argues that "because Biohaven had no approved products and depended almost entirely on the success of its clinical-stage pipeline, investor valuation of the Company was heavily tied to the perceived regulatory prospects of its lead drug candidates" including BHV-7000 and troriluzole. Am. Compl. ¶ 2. In Plaintiff's view, Biohaven's success or "business prospects" were also closely tied to the "successful development and regulatory approval" of these drugs. *Id.* ¶ 230. To support the claim that Defendants had motive to defraud, Plaintiff alleges that the Defendants' statements regarding BHV-7000 and troriluzole "coincided with and helped facilitate the [Biohaven's] ability to raise substantial capital" through its "April 2024 and October 2024 public

offerings" and its "April 2025 structured financing." *Id.* ¶ 235. Defendants were also allegedly motivated by a desire to "preserve investor confidence." *Id.*

The Court disagrees.

These allegations are insufficient to effectively plead scienter because the purported motivation is one shared by all corporate insiders. The motivation to raise capital and preserve investor confidence is "one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Gen. Elec. Co.*, 101 F.3d at 268. On these alleged motivations alone, the Court cannot find a strong inference of scienter.

Accordingly, Plaintiff has failed to sufficiently allege scienter in this way, and the Amended Complaint cannot be sustained on that basis.

#### ii. Circumstantial Evidence of Conscious Misbehavior or Recklessness

"Securities fraud claims typically . . . suffice[] to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Where plaintiffs allege that defendant "knew, or more importantly should have known that they were misrepresenting material facts related to the corporation" recklessness pleadings are usually sufficient.[9] *Id.* (citing *Goldman v. Belden*, 754 F.2d 1059, 1063–1070 (2d Cir. 1985) (finding allegations of recklessness sufficient where defendants released positive predictions about the prospects of a computer system's success despite their knowledge of facts that showed "grave uncertainties and problems concerning future sales"); *Cosmas v. Hassett*, 886 F.2d 8, 12 (2d Cir.

[9] In *Novak*, the court cites to a number of cases which precede the implementation of the PSLRA pleading standard and notes that those cases were decided using the correct pleading standard because "PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the "with particularity" requirement)." 216 F.3d at 310.

1989) (finding that the pleading standard was met where defendants identified Chinese sales as an "important" revenue source although "Chinese import restrictions" would "severely limit" revenue and defendants either knew or should have known that the restrictions would limit sales)).

"An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Gen. Elec. Co.*, 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F. Supp. 256, 259 (S.D.N.Y. 1989) (internal quotation marks omitted). *See also ECA Loc. 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (explaining that reckless conduct is "at the least conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."). "[P]ublic statements," made by a corporation or officials authorized to speak on its behalf, must be "consistent with reasonably available data." *Novak*, 216 F.3d at 309.

But corporate actors are not required to foresee, anticipate or prematurely disclose every hurdle, roadblock or misfortune that may befall the company or its efforts. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them . . . allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978); *Acito*, 47 F.3d at 53. And corporations can be optimistic in their projections. "[C]orporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.*

Ultimately, the facts alleged must provide "strong circumstantial evidence" of recklessness which creates a "strong inference of fraudulent intent." *Gen. Elec. Co.*, 101 F.3d at 269. Where a

plaintiff "fail[s] to demonstrate that defendants had a motive to defraud the shareholders, [the plaintiff] must produce a stronger inference of recklessness." *Eichler*, 264 F.3d at 143.

Defendants argue that Plaintiff fails to "identify specific information known contemporaneously by any speaker that so contradicted his [public] statements about troriluzole" Mem. in Supp. of Mot. to Dismiss at 32, 34.

Plaintiff alleges that Defendants' direct involvement in the development and regulatory applications for troriluzole and BHV-7000, access to internal clinical data, "and other non-public information concerning the efficacy and regulatory viability" of the drugs put them on notice that the strength of clinical evidence was low and regulatory approval was unlikely. Am. Compl. ¶¶ 229–230.

As it relates to development, testing, and regulatory applications for troriluzole this is the sum of the facts Defendants allegedly knew or recklessly disregarded:

> (1) After Study 206's failure to reach its primary endpoint, the underlying data from the study did not and could not constitute "substantial evidence" of efficacy necessary for regulatory approval. Am. Compl. ¶¶ 111,114, 117,123,128,
>
> (2) There were significant regulatory risks associated with relying on "an externally controlled comparison of participants" as Biohaven did in Study 206-RWE in part because the FDA "repeatedly informed" Biohaven during the regulatory review that externally controlled analyses were unlikely to show the "substantial evidence of effectiveness required for approval" and because the FDA "had never approved an NDA for a drug product based solely" on a real-world evidence study. Am. Compl. ¶¶ 117,138, 140,158,164, 179, 232.

As it relates to development, testing, and regulatory applications for BHV-7000 this is the sum of the facts Defendants allegedly knew or recklessly disregarded:

(1) "The preliminary biomarker and pharmacodynamic observations [Biohaven] cited in support of BHV-7000's neuropsychiatric development program did not demonstrate clinical efficacy." Am. Compl. ¶ 233.

(2) No data exists to suggest that BHV-7000 or similar drugs can treat mania. Am. Compl. ¶ 233.

Despite knowledge of these facts and "deficiencies" Defendants continued touting the possibility of success, according to Plaintiff.

The Court disagrees.

Plaintiff fails to demonstrate that any statement made by any Defendant was made at a time when that Defendant knew or should have known a contrary fact. The statements allegedly made by Biohaven and Mr. Coric following the initial failure of Study 206 are forthcoming about the study's failure to meet the primary endpoint but optimistic about a subset of results in the study (SCA3 results), the potential for those results to demonstrate efficacy, and perhaps support a New Drug Application to regulatory agencies. *See, e.g.*, Am. Compl. ¶ 112 (excerpting Biohaven's 2022 10-K form which describes the suggestion of a treatment effect for SCA3 patients, an intent to work with regulatory agencies, and a potential New Drug Application); ¶ 116 (quoting a statement by Mr. Coric noting the years long effort to bring a "potentially" new treatment to market using a "newly developed rating scale" developed "in consultation with the FDA").

"[C]orporate officials do not act recklessly simply by making optimistic projections that ultimately fail to materialize. Misguided optimism is not a cause of action, and does not support an inference of fraud." *Russo v. Bruce*, 777 F. Supp. 2d 505, 521 (S.D.N.Y. 2011) (citation

modified); *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 557 ("It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true, or constitute puffery or ordinary expressions of corporate optimism.") (citation modified); *Id.* ("Further, statements regarding future performance are actionable only if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.") (citation modified).

Nor does Plaintiff sufficiently allege misrepresentation of material facts regarding Study 206-RWE, the FDA's communication to Biohaven about Study 206-RWE, or the FDA's history of approval following real world studies. Defendants reported "topline" data, stated that the study was designed following FDA principles, and shared that Biohaven's "commercial team [was] already preparing for success." Am. Compl. ¶¶ 154–156. Plaintiff does not assert that these statements were patently false, but claims that the FDA warned Biohaven about its concerns regarding real world studies and also warned that approval was unlikely. This is insufficient. *See Gillis*, 197 F. Supp. 3d at 587 (explaining that while the FDA may require a heightened showing of evidence for some study formats, "investors were sufficiently apprised . . . [because] the public, through FDA regulations and guidance, was already on notice that the FDA preferred a double-blind methodology. . . [The company's] failure to disclose that the FDA had explicitly stated that its less favored methodology would require [the company] to make a heightened showing did not, in this context, make its statements misleading to a reasonable investor."); *Actinium*, 2026 WL 2621057 at *4 ("No reasonable investor would infer that mere statements of confidence suggested that the FDA had not engaged in industry-standard dialogue with Defendants about potential deficiencies in either the testing methodology or the drug itself.") (quoting *Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016).

None of Plaintiff's allegations sufficiently assert that Biohaven or Mr. Coric knew contradictory facts when they spoke. Defendants' statements read as optimistic statements about the data, the efficacy of the drug, and their potential for success with regulatory agencies. All other statements are factual statements about the stage of the study or review that the drug was in. "To any extent that . . . [the] allegation[s] [do] support any inference of *scienter*, such an inference would be outweighed significantly by inferences of non-culpable states of mind" *Argo Grp.*, 2024 WL 5089970 at *13 (emphasis in original). The most plausible inference based on the pleadings is that Biohaven was optimistic about the drugs' efficacy, conducted trials which yielded data that bolstered their belief, and submitted regulatory applications that ultimately fell short of the standards for approval. *See In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388–389 (2d Cir. 2021) (summary order) (citing *Novak*, 216 F.3d at 312) (finding that optimism by a corporation did not support an inference of recklessness because even if their statements were misleading it was more plausible that defendants believed they had developed a solution that later proved ineffective than the opposite inference that defendants consciously made statements with an intent to deceive or defraud).

Similarly, Plaintiff's allegations regarding Defendants' statements about BHV-7000 suffer from the same defects explained above. Plaintiff does not sufficiently allege that any statement made by any Defendant regarding the testing or development of BHV-7000 was made when the speaker had contradictory knowledge. Plaintiff alleges that Biohaven's use of the word "validated" in relation to the EMA application misled investors. Am. Compl. ¶¶ 130–131. As explained above, to the extent that the EMA administrative process and the associated language used to describe the steps in that process are publicly available or common knowledge, the allegation, that Biohaven intended to deceive or manipulate with their words, or that investors were somehow misled or

defrauded by Biohaven's choice of words is not plausible. *Cf. Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ("There is no duty to disclose information that is equally available to both parties or so basic that any investor could be expected to know it.") (citation modified).

Accordingly, Plaintiff has failed to sufficiently allege scienter in this other permitted way, and thus the Amended Complaint must be dismissed for its failure to allege scienter sufficiently.

**B. The Claims Against Each Individual Defendant**

Plaintiff brings a Section 20(a) claim against Mr. Coric and Mr. Buten based on their "control and authority as senior officers." Am. Compl. ¶ 258. "Scienter is also required to establish liability under Section 20(a) where, as here, the Section 20(a) claim is derivative of the Section 10(b) and Rule10b-5 claim." *Saraf*, 2024 WL 1298246 at *1 n.2. *See also ATSI*, 493 F.3d at 108 ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability.").

As a result, because Plaintiff fails to adequately plead a primary violation, the Section 20(a) claims against Mr. Buten or Mr. Coric also fail. *See Ark. Pub. Emps. Ret. Sys. V. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) ("To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation, such as one under Section 10(b) and Rule 10b-5.").

Accordingly, because Plaintiff has failed to adequately plead the Section 10(b) and Rule 10b-5 claim, the section 20(a) claim also cannot survive, and must be dismissed.[10]

[10]Having addressed the insufficiency of the pleadings in terms of both failing to allege false and misleading statements as well as scienter, the Court does not and need not assess the additional grounds for dismissal raised by Defendants.

### C. Leave to Amend

"As a general matter . . . district court[s] ha[ve] discretion whether or not to grant leave to amend . . ." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). "[L]eave to amend should be freely granted when justice so requires." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015); Fed R. Civ. P. 15(a)(2). "Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (internal quotation marks omitted). "In cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity." *Id.*

Plaintiff has already had one opportunity to amend the Complaint. Given the facts already alleged and the numerous public filings either addressing or placing in context these or any other potentially alleged facts, granting further leave to amend the Complaint is not warranted. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (finding that the district court did not err in denying leave to amend because "Plaintiffs have already had one opportunity to amend their complaint. Although that amendment was not in response to a motion to dismiss identifying particular deficiencies in the pleadings, it is unlikely that the deficiencies raised with respect to the Amended Complaint were unforeseen by plaintiffs when they amended.").

Accordingly, leave to amend the Amended Complaint will not be granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment for the Defendants, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 20th day of November, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE